## CROW et al. v. CONTINENTAL OIL CO.*
### No. 8717.

Circuit Court of Appeals, Fifth Circuit.
Dec. 8, 1938.

Ralph Gillen and D. A. Frank, both of Dallas, Tex., for appellants.

J. A. Gooch, of Fort Worth, Tex., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

Ed. R. Crow was killed by an explosion while working in the capacity of acetylene welder for the Continental Oil Company, appellee. Ruby Crow, his widow, individually and as next friend for their minor children, with David A. Crow and his wife, parents of the deceased, sued the company for the negligent death of Crow.

No error is assigned as against the pleading. The trial court directed a verdict for appellee. This is a case where decision turns upon the evidence alone.

The evidence shows that Ed. R. Crow was half owner of the EZL Tank Company. His partner made all contracts for the company and Crow directed the employees in their work. Crow was not a regular welder, but was a tank builder who built wood and steel bolted tanks. He had only been doing some welding for his company for a short time.

The appellant oil company was installing a battery of tanks and having found leaks in two of the tanks, their own welder not being available, they sought out Crow to do the welding or mending of the leaks. The use to which the tanks were to be put required that they be air tight. Air had been pumped into them and the leaks discovered. Oil from the wells was ready to be pumped into the tanks and it was urgent that they be mended at once.

The evidence disclosed that the EZL Company was under contract with the Continental Oil Company to recondition, clean and mend several oil tanks. This work was being performed by Crow and his men at the Continental Oil Company yards north of Nacona, Texas; and about two miles from the place where he was killed.

On a day in December, 1936, and while Crow was engaged in his work, the appellee company induced him to leave his work to go and mend the discovered leaks in two oil tanks, one known as a "gun barrel" and the other as a "hay" tank. These tanks were a part of a treating plant of the Continental Oil Company, and Crow had no interest in them. His company was not employed in any wise to do work on the two

tanks in question. Crow was working on the other tanks which were located over two miles from the two tanks in question. He was advised that it would not be necessary for him to bring helpers with him to do the work, but that the company would furnish him with such help as he needed, and his welding outfit was moved on the job by the company. No suggestion of employment was made to Crow, and no price for the work to be performed was intimated, so far as the evidence discloses. The mending of the tanks by Crow was in the nature of an accommodation, he being willing to quit his own work and lend his services in the mending of the tanks.

When Crow arrived he was immediately shown the leaks in the hay tank by one of the foremen of the company and he mended them. Thereafter the foreman conducted him to the top of the big gun barrel tank and pointed out to him the "pin hole" leak to be mended. Two of the oil company's employees were on top of the tank engaged in bolting down the manhole plate. When Crow applied the torch to the pin hole or leak an explosion occurred which blew the top off the tank. Crow was blown up into the air about one hundred feet; the company employees were blown about twenty-five feet. All three were killed.

The evidence further disclosed that the tanks and fittings connected with them had been used before and they had been moved into this new field and had been scraped and cleaned. The larger tank, the gun barrel, rested upon a concrete base about four feet high. The tank was between six and seven feet in diameter and sixteen to twenty feet in height. On the inside of this tank was a coil through which steam was propelled from a boiler; the steam heated the oil and it was then passed into the connected tank known as the hay tank. The hay tank was filled with excelsior through which the hot oil filtered before passing into other stock tanks. This was the way in which the crude oil was treated. The gun barrel tank had a manhole on top and another near the bottom and on the side which was known as a BS hole. On one side of the tank there was a cock and valve and a pipe that led away to an oil line a few feet distant; also a bypass of pipe leading up to the oil line, and another valve that would cut it off from the main line of oil. The evidence disclosed that the main line was actually being used and

had been in use for quite a while for the carrying of oil.

The evidence further shows that two or three hours before the explosion some men had been at work inside the tanks; the tops were off and the BS holes open big enough for a man to go through. No explosion took place, and no one detected gas at that time. After this the holes were closed and an air pump was attached in order to test the tanks. This test indicated the leaks in the coils of the hay tank and in the top of the gun barrel.

The evidence is without dispute that no dynamite or gun powder was about the tanks. When the explosion occurred smoke and flame came from the tank. It is further without dispute that the oil in the tanks generated what is known as Methane $CH_4$ gas, the simplest form of petroleum gas known, being one carbon atom to four hydrogen atoms; that in order to have an explosion one would have to mix the gas with air in proportions of between four and one-half percent and fifteen percent gas and the balance air, otherwise, there would not be enough oxygen to burn the methane; when the nitrogen in the air and the products of combustion are heated, they expand very rapidly and may cause an explosion.

The tanks were kept closed as much as possible in order to keep the gravity of the oil up; no gas is lost if it can be helped; if oil is run into these tanks when they are open, the gas gets away and that lowers the gravity of the oil. There is live gas in this oil, that is called live oil, oil that has gas in it. If the gun barrel tank was closed tight and in operation, gas would form at the top and the gas would go into the line that led back into the boiler, that being the only means of fuel for feeding the boiler.

The evidence is in conflict as to whether or not there was oil in the tank after the explosion; many of the witnesses testified that they looked into the tank after the explosion and found oil in the bottom of the tank two or three inches deep. Jim Phillips, a witness for plaintiff, testified, that the old gun barrel tank was in operation at the time of explosion. Graham, one of the foremen in charge testified, "I do not know any place it (the gas) could have come from except from this pipe line. I do know that if the valve had been turned, or was slightly open, gas could

have gotten into that tank, and that was the only place it could have come from so far as I know." Gough, assistant superintendent of the Oil Company, testified, "I know from general knowledge that a certain quantity of air, mixed with gas, if you apply a torch to it, will cause an explosion. I expect every man around the plant knew that, they are handling oil and gas all the time, and I warn them about it all the time. * * *" Hammer, an expert chemist, gave as his opinion that there was a leak in the oil line that caused the explosion. G. H. Pickett, head roustabout testified, "I had charge of that tank from the time it was put up there until the time it blew up, and I was the man in charge there of the works, everyone of them. * * I am employed by the Continental Oil Company and have been employed by them 15 years. * * * When he (Crow) came he did not ask me anything about the tank in any way. When he drove up, I helped him unload this welding outfit, set it on the ground, I took him to the hay tank and showed him where the hole was. * * I went up the ladder with him. He had a short hose, he couldn't reach the top, and he went up the ladder, and I carried the hose and handed it to him, it would not reach the ladder. / * * * Before Mr. Crow went up there he did not ask me if that was a safe place, and I didn't tell him it was."

We are clear in our opinion that Crow, the deceased, did not enter the premises of the Oil Company as an independent contractor. He was there as an invitee and it was the duty of this Company to exercise ordinary care to furnish him a reasonably safe place to perform the work of mending the tanks, and where a dangerous condition existed as it did, of which the Company knew or ought to have known, it should have warned Crow, or taken precautions against such dangerous condition of its premises with reference to the oil tanks. Montgomery v. Houston Textile Mills, Tex.Com.App., 45 S.W.2d 140; El Paso Printing Co. v. Glick, Tex. Civ.App., 246 S.W. 1076.

"The rule is well settled in the federal courts that, where the evidence in a civil case is such that reasonable men in a fair and impartial exercise of their judgment may honestly reach different conclusions, the case is for the determination of the jury." Farmers' National Bank v. Mis-

souri Livestock Commission Co., 8 Cir., 53 F.2d 991, 992.

The trial court gave, on motion, a directed verdict for appellee. In this the court was in error. There is abundant evidence in the record to carry this case to the jury.

Reversed and remanded.