## UNION TANK & SUPPLY CO. v. KELLEY.

### No. 12211.

Circuit Court of Appeals, Fifth Circuit.

May 7, 1948.

Rehearing Denied June 7, 1948.

HOLMES, Circuit Judge, dissenting.

———◆———

Chas. C. Crenshaw, of Lubbock, for appellant.

John J. Watts, of Odessa, for appellee.

Before HUTCHESON, HOLMES, and WALLER, Circuit Judges.

HUTCHESON, Circuit Judge.

Plaintiff, alleging [1] himself to be an employee of one Bruce Wimberley, an independent contractor, sued as "an invitee of defendant" for damages for personal injuries sustained while unloading, from a box car, sheets of steel belonging to defendant.

The claim was that defendant was liable because defendant's contract with Wimberley called for the performance of an inherently dangerous work, unloading, in the night time, wtihout adequate lighting, a box car full of heavy steel sheets which, to defendant's knowledge but not to plaintiff's, were so stacked as to be liable to fall, and defendant had failed to warn plaintiff of the grave dangers attendant on doing the work.

The defenses were a general denial that defendant had been in anywise negligent and special denials that the work was inherently dangerous and that plaintiff had not been advised of the dangers attendant upon doing it.

There was, too, an affirmative plea that, as alleged by plaintiff, plaintiff was an employee not of defendant but of Wimberley, and independent contractor, and if there was any negligence in not furnishing plaintiff a safe place to work, it was the negligence of his employer and not of defendant.

There was a further plea that plaintiff knew of and assumed the risks of doing the work, and if there was any negligence in connection with handling the steel sheets it was the negligence of plaintiff.

The evidence in some respects not material [2] to the issues was in conflict. In regard, however, to matters material to the decision of the case, whether the work was inherently dangerous, whether plaintiff knew of the conditions attending it, and whether defendant had in any respect violated its duty to plaintiff as an invitee, the evidence [3] presented no conflict whatever.

It is true that Kelley testified that no one had warned him that he was in danger of being injured. It is true, too, that he testified the steel sheets were leaning

---

[1] His petition alleged that, "while a business invitee of the defendant herein by virtue of having been an employee of one Bruce Wimberley, who then and there had a contract to unload a car of steel for the defendant herein", plaintiff had been injured by the negligence of defendant.

[2] As to whether, according to plaintiff Kelley, he was working in the east, or, according to Head and Wimberley, Kelley was working in the west end of the car; whether, according to Kelley, the car was being unloaded from the north side, or, according to Head, from the south side; whether, as Head testified, he had torn out all of the supports around the tank steel in the end of the car, leaving it free to fall or be handled; according to Kelley, the 2x4 in the end of the car was still there and some of the sheets were nailed into it at the back end of the car and some were not; and whether, as Head first testified, Kelley was not warned of the danger of working in the car, or, as he later testified, he was.

[3] One Joe Head, an employee of defendant, had general responsibility for and charge of unloading its steel. As to the particular car in question, he had gone into it and had to some extent unloaded the car and, finding that he needed help

against one wall, and that "As I had been told it had to be moved, I presumed it was safe to get in and take the steel out". But this testimony amounts to no more than a statement that, although he saw that a heavy piece of steel was kept from falling only because it leaned against the south wall, he didn't know that if righted up and allowed to lean toward the north wall without support, it would fall that way. His own evidence[4] shows beyond dispute that working in daylight for more than six hours in the car he saw that the sheets were so lying that if they had not been supported against the south wall of the car they would have fallen. He, therefore,

---

to get all his cars unloaded, he had given Wimberley, an independent contractor, a contract to unload this one.

As to the nature of the steel pieces and the usual and customary way of loading them for shipment in, and unloading them from, a boxcar, the testimony was without dispute.

The sheets were quite heavy, their dimensions were 5x8 feet, with a thickness of 1/8 to 3/16 inches, and they weighed, according to one witness, 185 to 235 pounds, plaintiff Kelley testifying that each sheet weighed approximately 500 pounds.

In loading the steel for shipment in a box car, a 2x4, or 2x6, or 4x4 timber would be nailed against the end wall of the car at about 4 feet above the floor. The steel sheets were about 5x8 feet and slightly curved, and each end had a chime or flange at a 90 degree angle to the sheet with holes near the top and bottom. A sheet would be taken in the car and set up on its edge with the 8 foot length of the sheet running parallel with the sidewalls of the box car and a nail would be driven through one of the upper holes in the flange and into the timber that had been nailed across the back end of the car to fasten the sheet in an upright position. This process would be pursued until the sheets filled the end of the car from one side of the car to the other; every other sheet being nailed to the timber at the back end of the car.

Then at the end of the sheets toward the center of the car a 4x4 timber would be nailed into the sidewalls of the car across the car at a point about 4 feet above the floor and a nail would be driven through one of the upper holes in the flange in the upper end of the sheets into the 4x4 to keep the sheets in an upright position, and also at the bottom of the ends of the sheets toward the center of the car a piece of timber would be nailed on the floor across from one sidewall to the other to prevent the sheets from slipping back and forth lengthwise in the car.

The usual and customary practice in unloading the sheets of steel was to tear out the timbers in the front or toward the center of the car. After that was done it was usual and customary to start unloading the sheets from one side of the car and take the sheets out one at a time. In order to break the sheets loose from where they were fastened to the timber at the back end of the car, the workman would take a hook and put it in one of the bottom holes in the flange at the front end and lift the front end of the sheet up about one foot high and then let it back down, which would pull the nail out at the back end of the sheet and the workman would then pull the sheet toward the center of the car. The only way these sheets could fall on a workman and pin him against the side of the car would be for the workman after he had unloaded a number of the sheets to go in between the remaining sheets and the side of the car.

[4] The only eye witness to the accident was the plaintiff, Kelley. After testifying that he and a Mexican helper went down to the car to start unloading it about 1:30 in the afternoon, and that they backed the truck up to the south door of the car and started unloading, he was asked the following questions:

"Q. Now when you started to unloading, you say that all of that particular steel or tin, whatever you call it, lying side by side, that it was all in the end in which you were unloading, except one or two pieces? A. Yes sir.

"Q. Now, was that straight steel, Mr. Kelley, or did it have a curve in it? A. It had a curve in it.

"Q. Was it back against the wall with the curve away from the north side of the box car? A. It was leaning on the south wall, in that manner (indicating).

"Q. Leaning against the south wall? Now, which wall was it you got hurt, the north or the south wall? A. It pinned me against the north wall.

"Q. Now, how was it leaning against this south wall as you saw it there? A. It was leaning there, according to the way I saw it, on its own free will."

An abstract of the balance of his testimony follows: First, as to the conditions and the manner of unloading:

At the time they started unloading he could not get in on either side of the steel. The steel sheets were about 5x8 and the ends had a flange on them and each sheet weighed approximately 500 pounds.

When they started they would put hooks in the holes on the sheet and pull them out and then take them over and

saw and knew everything that could have been told to him, that if the sheets were straightened up and swung over toward the north wall of the car, their weight, configuration, and size were such that if unsupported they would be bound to fall. There was nothing then in the work he was doing and the situation under which he was doing it which was not as fully known to him as to Head, nothing in the work that was inherently dangerous if it was done with reasonable care for the safety of the worker.

Defendant's motion for an instructed verdict made at the conclusion of all the evidence was denied, and over objections of defendant that the evidence did not raise them, the cause was submitted to the jury on all the issues tendered in plaintiff's petition.[5]

---

put them in a truck. The way they broke them out would be to put the hook in a hole close to the bottom, pull the sheets up, break them loose from the end of the car and take them out. There was a nail through the steel into the 2x4. He knew that the 2x4 or 2x6 was back there and they had to handle the sheets from the front. As soon as they pulled out enough so that one of them could get back in there he went in between the sheets and the side wall of the car eight or ten times before he got caught and hurt. He had been back in there some eight or ten times in the daylight and did not need any light to see the conditions there at that time. Some of the sheets were stuck into the floor of the box car at the back end and they would sometimes have to go back in there to break them loose. Some of the sheets were nailed to the 2x4 and some were not. Those that were nailed he saw them nailed and he saw some that were not nailed in the timbers when he went back there in broad daylight. As he took the sheets out he could see that they were leaning. On their first load they carried, as he recalled, 20 sheets. He had worked there from about 1:30 until the time he carried the first load up to the yard of the Union Tank & Supply Co. and unloaded it.

Second, as to the conditions and what occurred shortly before and at the time of his injury:

It was about dusk when they left the supply company yard and he went by and got his supper and waited for the Mexican to come back and then went back after the remainder of the stuff. When he went back to the car he found the unloaded portion of the material in the same condition as it was when he left. Bruce Wimberley told him to work that night and finish unloading the car. He lacked a small portion of unloading the car. When he went back he had gotten two or three sheets on his truck before the accident took place. When he went back to work that evening there was a light on the headache bar of the truck and he rigged up the light and turned it into the box car. It was his own light and he had put it on the truck himself to use in just such occasions as this and trained it just where he wanted it to go. With the light trained in there he saw how to get out the two or three pieces and then after that time he got caught between the side wall of the box car and the steel. Mr. Wimberley and several other men came in and lifted the steel and got him out and into Wimberley's car. At the time of the accident there were 23 sheets of steel left in the car. The light that he had was not sufficient and he asked Mr. Wimberley to get him one and Wimberley said he would ask Mr. Head. Joe Head was not there at the time that he knew anything about. After Wimberley said he was going to see Mr. Head, Appellee continued working there with the light that he had. He would say it was around 9:00 or 9:30 o'clock when he got back to the car and was after dark. It was pitch dark in the box car. After he had trained his light it was still too dark to work in there, but despite the fact that he knew he did not have adequate light he went in there and got caught.

As to the actual injury, he was asked the following questions:

The Court: "Q. Tell the jury what happened to you, Mr. Kelley? A. You mean in the car?

"Q. Yes? A. We went into this car to unload this tank steel. I had one other helper. Each stave was just about all two men could pick up.

"Q. Who was the helper, a Mexican or a white man? A. He was a Mexican. The Mexican couldn't talk English, so there was no conversation. We were both tired and were trying to get the steel out as soon as possible. They had nailed the steel. It is back in the car, and I had gone back to pull this nail out of this sheet of steel, coming to the front end of the car. Before I got to the front the steel fell and lodged me against the opposite side of the car."

[5] These issues were: (1) discovered peril; (2) failure to warn; (3) failure to furnish adequate lighting; (4) inherently dangerous work; and (5) ordering the work to be done at night.

Appealing from the verdict and judgment for plaintiff, defendant is here insisting that the evidence did not make out a case for the jury, and if it did, there were reversible errors in the charge.

We agree with appellant that the evidence did not present an issue of discovered peril or of inherently dangerous work, and that it was reversible error to charge on them.

We agree, too, that under the undisputed facts, the duty was on plaintiff's employer and not on the defendant to warn plaintiff of the dangers of working with steel at night and to furnish him with adequate lighting and that if there was any negligence in the discharge of this duty, it was the negligence not of defendant but of Wimberley, plaintiff's employer, and it was error for the court to charge these issues to the jury.

It will not be necessary, however, for us to set out or discuss the complained of portions of the charge for we agree with appellant that, on the undisputed evidence, no case of liability as against the owner was made out, and that, as requested by it, a verdict in its favor should have been instructed.

It will be sufficient then for us to briefly state the principles of law controlling here and point to the facts which, as matter of law, demanded a verdict for defendant.

As stated in 23 Tex.Jur., Independent Contractor, Sec. 15, Liability to Third Persons, Basic Rule: "The basic rule of this subject is that an employer is not responsible for the acts or omissions of an independent contractor, his sub-contractors or servants, committed in the prosecution of work that is not in itself unlawful or attended with danger to others. The employer having no duties, he is not liable because the contractor may have violated the obligations resting upon him. The doctrine of respondeat superior has no application. * * * Accordingly, an instructed verdict in behalf of the employer is properly ordered where the undisputed facts call for an application of this general rule."

As fully set out in Sections 16 to 23, incl., there are, of course, exceptions to this rule. However, under the settled law in Texas and generally elsewhere, "The burden of bringing his case within an exception to the general rule exempting an owner or employer from liability for the contractor's negligence rests upon the plaintiff, 23 Tex.Jur., Sec. 16, p. 562.

The plaintiff in this case recognized this burden and undertook to discharge it by claiming: (1) that within Sec. 16, the owner "interfered with the contractor" by directing him to work at night; (2) that he breached the duty laid down in Sec. 21 to plaintiff as an invitee; and (3) that, as set out in Sec. 22, "the work contracted for "was unusually dangerous in itself as a result of circumstances brought about by the owner or employer in the first instance, and the injury" was "the proximate result of such conditions". The difficulty with plaintiff's case arises out of the fact that the evidence does not support his claims that he brought his case within any of these exceptions.

As to the first exception, there is no evidence whatever that Head, who for defendant employed Wimberley, plaintiff's employer, in any manner interfered with the contractor in the discharge of his work. The fact that he told Wimberley that the steel must be gotten out that night was not an interference with the contractor in the doing of the contracted work. It was merely the expression of a desire which was neither unlawful nor unreasonable. It imposed no duty whatever on the owner to provide lighting or other means to do the work safely. This was the duty of the contractor, the failure to perform which was the negligence of the contractor, the very thing that an owner is not liable to the contractor's servants for.

Neither is plaintiff any better situated on the breach of duty to plaintiff as invitee to exercise ordinary care to furnish him a reasonably safe place to work. The governing rule here is thus set out in 23 Tex.Jur., Sec. 21, p. 568: "The employer is under a duty to guard the servants of the contractor against any dangerous condition known to him but not to the workmen. But as against open, obvious and apparent dangers, known to the workmen,

the employer or owner of the premises is under no obligation of protection. Nor may he be held responsible for an injury caused by transitory conditions incident to the progress of the work * * *".

As shown by the evidence of Kelley, note 4, supra, the injury he sustained was "caused by transitory conditions incident to the progress of the work". These conditions were created by him in moving the other plates and in pulling the particular piece free from its nail. The dangers arising out of these conditions, that a heavy piece of steel might in handling be caused to come off balance and fall if not supported, were open and obvious. They had been seen by, known to, and avoided by him for the eight hours that he had been working, some six of them in full daylight.

Nor can plaintiff avail himself of the exception dealt with in Sec. 22, Work Inherently Dangerous. In the first place, as pointed out in Humble Oil & Refining Co. v. Bell, Tex.Civ.App., 180 S.W.2d 970, at page 975, quoting 14 R. C. L. p. 95: "The rule imposing liability on the employer is for the protection of third persons, not for the protection of the contractor's servants, and the latter cannot hold the employer responsible * * * solely upon the theory that the work * * * was intrinsically dangerous."

But in the second place, and more importantly, as pointed out in Section 22, and the cases cited by it, the "intrinsically dangerous" exception does not apply to dangers from obvious risks connected with ordinary tasks, such as construction, loading, and unloading, especially where, as here, special skill was not required to avoid injury but only the exercise of ordinary care.[6] Cases where it typically applies are cases of "unusual perils" such as those in the cases cited and relied on by appellee, dangerous gas and oil tanks,[7] dangerous electric wires,[8] maintained and operated by the owner, and cases like Sun Oil Co. v. Kneten, 5 Cir., 164 F.2d 806, where work of the owner is being carried on concurrently with the work of the independent contractor, and the negligence of the owner, either operating alone or concurrently with that of the contractor, causes the injury.

Appellee, supporting his claims by citing cases particularly Amacker v Skelly, 5 Cir., 132 F.2d 431, 433, an opinion by the writer, cites them as though they held that the duty of an owner of premises to an invitee, the servant of an independent contractor, is the same duty as that of a master to a servant. In so citing them he completely misconstrues them. In the Amacker case, which seems to be the most strongly relied on, the appeal was from an instructed verdict. The court stating: "On this record, the defendant had supervision and control over deceased and was under a duty to exercise due care to see that the dangerous work it put him to doing was done by reasonably safe and prudent means and methods", reversed the cause for a new trial on this and other issues presented. This is pointed out in the opinion on the last appeal of the case, Gipson v. Skelly Oil Co., 5 Cir., 152 F.2d 588.

In Humble Oil & Refining Co. v. Bell, 180 S.W.2d 970, 976, the Texas Court of Civil Appeals correctly pointing out that in Amacker's case and in Crow's note 7, supra, the employer assumed control of the work, concludes: "In each case the relationship of the contractee to the plaintiff therein was analogous to that of master and servant".

Here the undisputed evidence establishes, indeed it is conceded, that the plaintiff's relationship to the owner was merely that of an invitee. Here the fundamental principle which underlies the duty of an owner to an employee of an independent contractor is wanting. Here there was no hidden or concealed danger, no

---

[6] Cf. Holt v. Texas New Mexico Pipe Line Co., 5 Cir., 145 F.2d 862; Allen v. Republic Bldg. Co., Tex.Civ.App., 84 S. W.2d 506; Lone Star Gas Co. v. Kelly, Tex.Com.App., 46 S.W.2d 656; Dixon v. Robinson, Tex.Civ.App., 276 S.W. 770; Joseph Foard v. Maryland, 4 Cir., 219 F. 827.

[7] Amacker v. Skelly Oil Co., 5 Cir., 132 F.2d 431; Crow v. Continental, 5 Cir., 100 F.2d 292.

[8] Galveston-Houston Elec. Co. v. Reinle, 113 Tex. 456, 258 S.W. 803; West Texas Utilities Co. v. Renner, Tex.Civ. App., 32 S.W.2d 264, 265.

source of danger from operations or conditions under the owner's control. The only danger to plaintiff arose out of the way and manner in which he did the work, a danger which he created and which was completely obvious to him.

He testified that he went into the car in broad daylight at 1:30 with both doors open. He testified that he saw that the sheets were lying free and were leaning against the south wall of the car. He testified, too, that he worked in the car for many hours afterwards, moving as many as 23 of the sheets, still in broad daylight. He, therefore, saw and knew as well as, in fact far more clearly than, anybody could tell him, that if in pulling the sheets out they were pulled upright and swung over toward the north wall of the car so that they would lean that way, their weight, configuration, and size were such that if overbalanced and unsupported, they would be bound to fall. There was nothing in the work and the situation which was not as fully known to him to defendant, nothing in it that was dangerous if the work was done with ordinary care for the safety of the worker. There was no danger requiring special skill to avoid, in fact no danger at all except that arising from the changing positions of the steel sheets as plaintiff pulled them out. The case is controlled by Kuptz v. Sollitt, 5 Cir., 88 F.2d 532, and the rules established by the Texas cases.

The judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

HOLMES, Circuit Judge (dissenting).

My failure to concur in the opinion of the majority is due to the fact that too many questions have been decided therein which I think should be left to the jury upon another trial. I think the court below did not err in refusing to direct a verdict for the defendant. There are two grounds that might warrant re-submission of this case to a jury: first, whether in the absence of warning the work at night, without adequate lighting, was inherently dangerous; second, whether the defendant interfered with the independent contractor by giving orders as to the details of carrying on the work, especially by directing that the work

be continued at night until the car was unloaded. 27 Am.Jur., Sec. 31 p. 510.

Because the plaintiff had worked eight hours before being injured did not, in my opinion, excuse the original negligence, if any, of the defendant. A workman engrossed upon his task may be slower to realize his peril than if he had been forewarned. He was at least entitled to the warning in advance, so that he could determine for himself whether he would undertake the dangerous work. The questions of inherent danger, failure to warn, intermeddling or interference, assumption of risk, contributory negligence, and other controverted issues upon this record, are peculiarly for the jury.