**GULF OIL CORPORATION, Appellant,**

v.

**Kenneth C. BIVINS, Appellee.**

**No. 17843.**

United States Court of Appeals
Fifth Circuit.

April 1, 1960.

Rehearing Denied May 9, 1960.

John R. Brown, Circuit Judge, dissented in part.

Max N. Osborn, William L. Kerr and James T. Smith, Midland, Tex.; Turpin, Kerr, Smith & Dyer, Midland, Tex., of counsel, for appellant.

Clarence E. Keys, Warren Burnett, Odessa, Tex., for appellee.

Before CAMERON, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

Plaintiff Kenneth C. Bivins was employed as an oilfield roustabout by O. R. White, referred to as Ray White, who operated as White Well Service, in the business of reworking oil wells. Part of White's work was done for the defendant, Gulf Oil Corporation, under a written contract. Bivins was part of a White Well Service crew dispatched by Ray White to pull the tubing, change flow valves, check the packer and check for cave-ins on a Gulf well in Ward County, Texas. Mr. White acted pursuant to a work order received from Gulf's local production foreman. By custom and under the terms of the contract, Gulf told Mr. White that work needed to be done on a given well but the details of performance and supervision were left up to White.

The crew of which Bivins was a member arrived at the well site about 3:30 P. M. on March 2, 1956, and began erecting the mast on the pulling unit and disconnecting the well from incoming gas injection lines and outgoing flow lines. The well was then bled so that all gas in the casing could escape. This bleeding process went on for thirty minutes to insure that all the gas had escaped.

After the gas had been bled off, Bivins started to remove the flange from the casing head. To do this he had to go down in a cellar in which the christmas tree was located. This cellar was eight feet deep and eight feet on each side. It was walled with wooden planking and

covered with 3 x 12 timbers. Some of the covering timbers were removed by the crew to allow entrance to the cellar. There being no ladder available, Bivins climbed down the christmas tree and began loosening the bolts on a flange. He called up to the surface for another tool. While he was waiting for it to be handed down to him, there was an explosion and fire in the cellar and Bivins was badly burned.

After recovering workmen's compensation, Bivins brought this action against Gulf. A jury trial was had with the verdict and judgment for Bivins. Gulf prepared its brief in keeping with the Texas state court practice setting forth and then restating, as points, its several specifications of error. Bivins, in his brief, countered with counterpoints and in them stated the converse of the points set forth by Gulf. In turn, Gulf filed a reply brief with seriatim replies to Bivins' counterpoints. Bivins then, in a supplemental brief, reiterated and reargued his counterpoints.

The explosion which injured Bivins apparently resulted from the ignition of gas which somehow got into or remained in the cellar after the bleeding of the casing pressure. The igniting flame came, it might be inferred, from iron sulphide contained in the gas in the well. Iron sulphide sometimes forms into flakes inside a well and, on being exposed to the air, begins to smolder and burn. Although Gulf did not know to a certainty that the well in question had an iron sulphide condition, it did know that there was a possibility that the well was so affected. Gulf, through an employee, had warned Ray White that wells in this area were suspected of containing iron sulphide. Both Gulf and White, on the day of the accident, warned the chief of

Bivins' crew to watch for such a condition on the well in question. This warning was not directly communicated to Bivins.

The trial court instructed the jury that if Gulf failed to warn Bivins of the dangerous condition, and this failure was negligence, and a proximate cause of Bivins' injuries, Gulf would be liable for the damages suffered by Bivins.[1] Gulf requested an instruction which would have absolved it of liability if it were found that Gulf had warned Bivins' employer of the condition. The request was refused and this refusal is assigned as error.

■■ At this point it may be observed that an owner or occupier of property is not liable for injury to the employee of an independent contractor or sub-contractor in the absence of negligence on the part of the owner or occupier which caused or contributed to the injury. Humble Oil & Refining Co. v. Bell, Tex.Civ.App., 180 S.W.2d 970; Union Tank & Supply Co. v. Kelley, 5 Cir., 1948, 167 F.2d 811. It is sometimes said that the owner or occupier is under a duty to furnish a safe place to work for the employee of the independent contractor. This statement is too broad and is an oversimplification of the principle. More accurately phrased, the rule requires the owner or occupier to exercise ordinary care to keep the premises in a reasonably safe condition so that the employee will not be injured. Robert E. McKee, General Contractor v. Patterson, 153 Tex. 517, 271 S.W.2d 391; Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853. Even as so stated, the rule is subject to qualifications as will be noted.

Whether or not there is responsibility for the condition of the place of work

[1]. The charge read: "You are instructed that if you find from a preponderance of the evidence that the Defendant, Gulf Oil Corporation, through its employees, failed to warn the Plaintiff, Kenneth Bivins, of a dangerous condition to which he was subjected, if any, and if you further find and believe from a preponderance of the evidence that the failure of such employee, if any, to warn the said Kenneth Bivins of the danger, if any, to which he was subjected constitutes negligence, and that such negligence, if any, was a proximate cause of the Plaintiff's injuries and damages, then you will find for the Plaintiff * * *."

may depend upon the control of the premises and the control over the conduct of the work by the person against whom liability is asserted. Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99; Houston Pipeline Co. v. Peddy, Tex.Civ.App., 292 S.W.2d 364; Sunray Oil Corporation v. Allbritton, 5 Cir., 1951, 187 F.2d 475, rehearing denied 5 Cir., 188 F.2d 751, certiorari denied 342 U.S. 828, 72 S.Ct. 51, 96 L.Ed. 626; Gulf Oil Corporation v. Wright, 5 Cir., 1956, 236 F.2d 46. It has been said that in the absence of control there is no duty. Nance Exploration Co. v. Texas Employers' Insurance Association, Tex. Civ.App., 305 S.W.2d 621, certiorari denied Flowers v. Nance Exploration Co., 358 U.S. 908, 79 S.Ct. 235, 3 L.Ed.2d 229. The district court here assumed, in its charge to the jury, that Gulf retained such control as cast upon it the obligation of an owner or occupier, although the question of control was not mentioned in the charge. However, Gulf did not, in this case, retain control of the premises and had no representative present at the site of the work. In this respect the situation differs from that in the Allbritton and the Wright cases, and it will be noted that in the latter case one of the judges of this Court in a specially concurring opinion, thought the control was not such as to create liability. In the Nance case Gulf Oil Corporation was the lessee of the owner and it had entered into an agreement for exploration work with an independent contractor which, in turn, made an agreement for a part of the work with a sub-contractor whose employee was injured. There the court directed a verdict for Gulf which had an oil and gas lease from the landowner as it has in this case.

■■■ The statement in the Nance case that in the absence of control there is no duty perhaps went beyond the necessities of that case and may be subject to qualification even though it be a good statement of the general rule. There is a distinction between an unsafe condition incident to or resulting from the work to be done and an unsafe condition inhering in the premises where it is to be done. We think it would be an unsound rule that would relieve the owner or occupant of liability for a concealed or latent condition of danger not incident to the work to be done, merely by surrendering control to an independent contractor. This distinction is pointed out in Moore v. Texas Company, Tex.Civ. App., 299 S.W.2d 401. There it was held that the owner of the premises where work is to be done is under no duty to the employee of an independent contractor to give him warning of transitory dangers which might arise during the performance of the work, but the court recognized that there might be such a duty where the danger arose from the condition of the premises. The owner or occupier of premises has a duty to warn the employee of an independent contractor of hidden or inherent dangers. Smith v. Henger, supra; Roosth & Genecov Production v. White, supra. Gulf, as lessee of the premises, stands as an owner or occupier of the premises in its relation to White and Bivins. The duty of the owner or occupant does not extend to the employees of the sub-contractor who know or should know of the existence of a particular condition and who appreciate or should appreciate its dangers. Robert E. McKee v. Patterson, supra.

■■■ The liability of the owner or occupier of the premises which harbors a latent, concealed, or inherent defect, to the employee of an independent contractor is not absolute and unconditional. It may be discharged by a warning. As set forth in the Restatement,

"A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he

"(a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, and

"(b) has no reason to believe that they will discover the condition or realize the risk involved therein, and

"(c) invites or permits them to enter or remain upon the land without exercising reasonable care

"(i) to make the condition reasonably safe, or

"(ii) to give a warning adequate to enable them to avoid the harm without relinquishing any of the services they are entitled to receive, if the possessor is a public utility." Restatement, Torts § 343.

This section of the Restatement has had judicial approval in Smith v. Henger, supra; Houston National Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374; and Gulf Oil Corporation v. Wright, supra. We do not understand that Bivins contends that Gulf could not have discharged any duty it may have had to him by a warning. It is his contention that he was not warned. The evidence, we think, would support the findings of the jury that the premises contained an inherent, concealed or latent danger of which Bivins was without knowledge. Under such a factual situation there arose a duty of Gulf to warn Bivins. No warning was given directly to Bivins by Gulf or by anyone else. Warning was given to White and to White's foreman under whose direction Bivins was working. The decisive question then is, was the duty of Gulf to Bivins discharged by the warning given to White and his job foreman?

It has been stated that, "Apparently the Texas Courts consider it sufficient to warn the independent contractor alone in order to discharge the duty of giving warning to the latter's servants, but the matter is open to question." Comment, The Duty to Furnish a Safe Place to Work to the Independent Contractor and His Servants, 11 Baylor Law Review 170. The Texas precedents are few. The earliest of the Texas decisions follows the rule that warning to the independent contractor is enough. It was held in Proctor v. San Antonio Street Railway Co., 26 Tex.Civ.App., 148, 62 S.W. 938, 939, decided in 1901, that the duty rested upon the independent contractor, he having knowledge of the danger, to warn

his employee, and no such duty rested upon the contractee. In 1924 the Texas Supreme Court, answering a certified question, announced a contrary doctrine in these words:

"The court answers that it was the duty of the interurban company to exercise ordinary care to give Reinle notice of warning of the danger of the boom coming in contact with, or in close proximity to, the uninsulated high-voltage wires, notwithstanding Reinle was an employee not of the interurban company, but of the independent contractor, who possessed full knowledge of the danger." Galveston-Houston Electric Ry. Co. v. Reinle, 113 Tex. 456, 258 S.W. 803, 806.

It is suggested in the Baylor Law Review comment from which we have quoted, that the Reinle case may be distinguished on its facts. Whether so or not, the case has not been followed in recent decisions. Nance Exploration Co. v. Texas Employers' Insurance Association, supra, was a case involving exploration work by an independent contractor for the lessee under an oil and gas lease. Uninsulated high voltage lines were present as a danger. The danger was known by Bailey the overseer of the independent contractor, and by Greer, a driller under whom one Flowers worked as a helper. Flowers, who disclaimed knowledge that the line was an electric power line, drove a truck carrying a thirty-five foot upright drilling mast into the line and was injured. The factual situation was not wholly unlike that in Reinle. Among several grounds for rendering judgment for the contractee, the court held:

"Furthermore, if appellee was entitled to warning of the danger, he had received that warning because his superior, Bailey, under the undisputed evidence, knew of said danger and, under the undisputed evidence, had warned Greer of the danger. Therefore, both of appellee's superiors knew of the danger, and,

under the last quotation from McKee v. Patterson, supra, that amounted to knowledge of the danger on the part of appellee." 305 S.W.2d 621, 626.

This Court has reached the same conclusion in Union Tank & Supply Co. v Kelley, 5 Cir., 1948, 167 F.2d 811, where it was said:

"We agree, too, that under the undisputed facts, the duty was on plaintiff's employer and not on the defendant to warn plaintiff of the dangers of working with steel at night and to furnish him with adequate lighting and that if there was any negligence in the discharge of this duty, it was the negligence not of defendant but of Wimberly, plaintiff's employer, and it was error to charge these issues to the jury." 167 F.2d 811, 815.

The foregoing language was quoted with approval in the Nance Exploration Co. case, supra.

Text approval of the rule has been thus given, "Warning to the superiors in employment of a person is warning to that person, the employment relation permitting a reasonable assumption that such notice will be communicated in the ordinary course to all employees on the work." 1 Shearman and Redfield on Negligence, Rev. ed. 66, § 26. The sound reason for such a rule has been stated in a New York case where notice of the danger had been given to the foreman but not to the employee who received fatal injuries while on the job. The court said:

"Warning of danger was thus given to all men in charge of the work and to all supervisory officials of the decedent. * * * To require the defendant to bring notice home to every employee of the lighting company who might possibly be involv-ed on this job on penalty of otherwise failing in duty would result in imposing a standard of duty exceeding reasonable bounds. * * * The employee has placed himself in a relationship where it may be reasonably assumed that notice to his supervisory officials will be communicated in the ordinary course to all employees on the work." Storm v. New York Telephone Co., 270 N.Y. 103, 200 N.E. 659, 661.

The same principle is stated in Schwarz v. General Electric Realty Corporation, 163 Ohio St. 354, 126 N.E.2d 906; Hotel Operating Co. v. Saunders' Adm'r, 283 Ky. 345, 141 S.W.2d 260. The Storm case and its holding have been approved in Whitlow v. Seaboard Air Line Railroad Co., 4 Cir., 1955, 222 F.2d 57, and Florida Power & Light Co. v. Robinson, Fla., 68 So.2d 406. See also American Mutual Liability Ins. Co. v. Chain Belt Co., 224 Wis. 155, 271 N.W. 828.

■ We are persuaded by both precedent and principle that the owner or occupier of particular property has a duty to warn the employees of an independent contractor who has undertaken to do work on the property, of dangers that are hidden on or inhere in that property, and that this duty is discharged if those in charge of the work for the independent contractor are given warning or have knowledge of the danger. This conclusion is not in conflict with that which was decided in Gulf Oil Corporation v. Wright, supra. It was error, therefore, for the court to give the quoted instruction.

■ The district court submitted two other theories of liability to the jury. One of these was put by an instruction [2] which made an issue of negligence liability based on whether Gulf failed to discover the presence of iron

2. "[I]f you find and believe from a preponderance of the evidence that gas or other substance stood in the pipes or casing in question, which was of such a nature as would ignite upon being exposed to air, and that the same constituted a danger; and if you further find * * * that the Defendant Gulf Oil Corporation failed to discover said danger, if any, and that such failure, if any, was negligence. * * and that such negligence if any, was a proximate cause of plaintiff's injuries then, you will find for the plaintiff * * *."

sulphide in the well. Since, as we have shown, Gulf knew of the possibility that iron sulphide was in the well, Gulf would not be liable for a failure to discover the dangerous condition unless it further failed, because of its ignorance or neglect, to warn of the presence of the condition. As is stated in 30 B Texas Jurisprudence, 255, Negligence § 60.

> "Where the defendant owner was 'negligent,' in the sense that he knew or ought to have known of the danger, recovery by the plaintiff depends on the further question as to whether the defendant was 'negligent' in the sense that he could have prevented the calamity * * * as, for instance, by the giving of sufficient warning of the peril."

Since we hold that the warning given by Gulf was a legally "sufficient warning of the peril," any question of negligence in failing to discover the peril warned of becomes immaterial and it was therefore error for the court to charge on this point. See also 38 Am.Jur. 757, Negligence § 97.

▮▮▮▮▮ The instruction[3] submitting the remaining theory of liability assumes that there was a defective gate valve. This was not admitted and, as we think, was not proved. The instruction actually covers two theories: (1) Failure to remedy or warn of a defective gate valve, and (2) Failure to remedy or warn of the gas. As to the latter, what has already been said is sufficient to show that this charge was erroneous unless it be said that the jury could properly find that

only by eliminating the gas condition could Gulf escape liability. To approve such a proposition would be to make Gulf an insurer of Bivins' safety. This is a burden that Gulf was not required to assume. McElhenny v. Thielepape, 155 Tex. 319, 285 S.W.2d 940; 30 B Texas Jur., Negligence § 58.

The theory that Gulf was negligent in maintaining a defective gate valve and failing to warn of its presence or remedy the defect was raised by the pleadings. This theory was not mentioned at the trial except for the quoted portion of the charge. There is no direct evidence whatsoever on this point. There is but meager testimony relating to gate valves. To show the significance of this testimony, we review a portion of the evidence.

As has been stated, prior to the explosion, all input and flow lines had been detached from the well, or christmas tree, and the casing had been bled for thirty minutes so that all gas therein would escape. Between the union or joint on the gas input line, which was broken in the bleeding process, and the casing itself, was a section of pipe containing a gate valve. In a deposition taken before the trial, Lawrence Q. Griffin, Gulf's local production foreman, who died prior to the trial, testified concerning his visit to the location shortly after the explosion:

> "Q. How long did the fire burn, if you know? A. Well, I went out there, and then went back in after him; there wasn't any of them there when I got there the first time.

---

3. "You are also charged that, as a matter of law, the Defendant, Gulf Oil Corporation, is charged with the non-delegable duty of making such inspections, if any, you find and believe from a preponderance of the evidence ordinary and reasonable care would require to determine if the place in which the Plaintiff, Kenneth Bivins, was working was in fact a safe place in which to work. In this connection, you are instructed and charged that, if you find and believe from a preponderance of the evidence that a reasonable inspection, if made, would have revealed the danger, if any, in the presence of a defective gate valve allowing gas and other substances to leak into the cellar in question, if that condition was present, or the presence of a gas or substance in the pipes which would ignite when being exposed to the air, if that condition was present, and if you further find and believe from a preponderance of the evidence that the Defendant failed to remedy such condition, if any, or failed to warn the Plaintiff thereof, and that such failure, if any was negligence, and that such negligence, if any, was a proximate cause of the injury in question, then you will find for the Plaintiff * * *."

"Q. Was it burning? A. Yes, the boards were burning.

"Q. Is that all that was burning when you got there? A. Yes.

"Q. There wasn't any gas burning? A. There was a little bit coming out of the casing, burning just a little bit.

"Q. Out of the casing? A. Out of the casing, where they parted this union on that gas line, and when they put the boards out with that water, I just slapped my hand over that and put it out. I had gloves on, of course, as I didn't want to touch that hot metal."

Bivins, in his brief filed with us, interprets this testimony as follows:

"Evidence as to the defectiveness of one of the gate valves is shown by the testimony of Messrs. Griffin and Fine. Mr. Fine said that Appellee was breaking the flange loose between two gates, and Mr. Griffin said that after the fire occurred he went out to the well and gas was coming out of the line 'where they parted this union on that gas line,' and that he just slapped his gloved hand over it to put it out. Of course, if the gate valves had been closed, as he said it [sic] was, gas could not have been coming out of the line at the broken union, *unless the valve was defective.* The jury had this evidence for consideration."

The quoted testimony of Griffin does not, nor does the testimony of anyone else, state that a gate valve controlling the flow of gas from the casing had been closed. Griffin testified that the valve on the line coming in from an outside pipeline to put gas into the casing for the gas lift system was closed. But this line had been completely disconnected from the well at the time Griffin saw the fire and this testimony has nothing to do with a possibly defective gate valve allowing gas to escape from the casing. Other testimony relating to the opening and closing of valves was given by crew chief Fine. Fine related how the crew

bled the pressure off the casing. At the end of his narrative specific questioning resumed:

"Q. All right. You were in the process of draining the pressure off of the casing, is that correct? A. Yes, sir.

"Q. In other words, whatever gas existed between the casing right here (indicating) and the tubing, all the way down to the bottom of the hole, was bled out, is that correct? A. Yes, sir.

"Q. So that there would be no gas in there? A. That is right.

"Q. Now, is that the usual operation? A. Yes, sir.

"Q. It is necessary to do that before you can pull the tubing, is it not? A. Yes, sir."

An examination of the evidence shows that it would have been impossible to bleed out "whatever gas existed between the casing * * * and the tubing, all the way down to the bottom of the hole * * *" without opening one or both of the gate valves in the pipes connected to the casing. The testimony of Bivins himself supports this:

"Q. Will you tell the jury what you did when you bled down the well? A. Well, first we closed the well * * * and screwed out that pressure valve, and I taken off the meter, and then we opened everything up to where it would clear of gases."

Thus the only basis for the instruction upon a defective gate valve was surmise or conjecture. The Texas law is quite clear that in such a case there is no evidence of probative force to go to the jury on the question of negligence.

"To establish a fact by circumstantial evidence, the circumstances relied on must have probative force sufficient to constitute the basis of a legal inference; it is not enough that they raise a mere surmise or suspicion of the existence of the fact or permit of a purely speculative conclusion. The circumstances relied on

must be of such a character as to be reasonably satisfactory and convincing, or, as it has been said, sufficient reasonably to produce belief of the existence of the fact which is sought to be shown by them. At all events they must not be equally consistent with the nonexistence of the ultimate fact." 17 Tex.Jur. 908, Evidence § 409.

See also Perren v. Baker Hotel of Dallas, Inc., Tex.Civ.App., 228 S.W.2d 311; City of Corpus Christi v. Gregg, Tex.Civ.App., 275 S.W.2d 547, reversed on other grounds, 1956, 155 Tex. 537, 289 S.W.2d 746; Big Three Welding Equip. Co. v. Reeh, Tex.Civ.App., 301 S.W.2d 504; Lynch v. Ricketts, Tex.1958, 314 S.W.2d 273, 277.

■ It is shown that it was necessary to open the gate valves in the pipes leading from the casing to bleed off the gas from the casing before pulling the tubing. It is not shown that these gate valves should not have been kept open in furthering the purpose for which they were opened. No reason is advanced as to why they should have been closed.

■ One other ground remains. The court's charge first discussed was apparently understood by all to be submitting solely the theory that the ignitible gas constituted a "dangerous condition" of which Bivins should have been warned. Bivins contended that Gulf was negligent in failing to provide an escapeway from the cellar and there was testimony that, contrary to custom, no ladder was provided on the well in question. This theory was not given to the jury in the charge unless it was in the portion just noted. Bivins had no objections to the charge and had no requested charges refused by the court. Be that as it may, the Texas cases make clear that Gulf would not be liable for failure to provide a ladder if Bivins realized that this left him with no escapeway from the cellar and yet went into the cellar of his own volition. See Robert E. McKee, General Contractor v. Patterson, 153 Tex. 517, 271 S.W.2d 391. Gulf would be under no obligation to warn of such an open and obvious condition. McKee v. Patterson, supra; Smith v. Henger, supra.

The conclusions we reach require that we reverse the judgment of the trial court and here render judgment for defendant, Gulf Oil Corporation.

Reversed and rendered.

JOHN R. BROWN, Circuit Judge (concurring in part and dissenting in part).

I respectfully dissent as to the holding of the Court:

"We are persuaded by both precedent and principle that the owner or occupier of particular property has a duty to warn the employees of an independent contractor who has undertaken to do work on the property, of dangers that are hidden on or inhere in that property, and that this duty is discharged if those in charge of the work for the independent contractor are given warning or have knowledge of the danger."

This includes, of course, the reversal and rendition flowing from the adoption of this decisive rule of law. I concur in the Court's discussion of the nature of the duties of an occupier leading to the conclusion that Gulf owed a duty to Bivins. I concur also as to the other action taken and the supporting reasons so persuasively advanced by the Court.

As to the limited, but decisive, issue on which we differ, the Court quite properly characterized the "decisive question" to be whether "the duty of Gulf to [warn] Bivins" was "discharged by the warning given to White and his job foreman?"

It is because the rule announced is stated in such positive and precise and conclusive terms that I feel compelled to register my disagreement. It transcends this case and is and will be—so long as it stands—a formidable lessening of the duty of an occupier to exercise reasonable care to make the premises safe for employees of independent contractors.

At the outset it bears emphasis that the rule now formulated for the first

time eliminates the necessity for a warning altogether. The rule does not require a warning by the occupier to the independent contractor. Under it the exoneration of the occupier from liability is not conditioned upon proving that warning was given to the independent contractor. As stated, the rule does, of course, establish that such warning is an insulation. But as expressed in the rule the non-liability is automatic not because (a) warning was given to the independent contractor, or (b) the hazard was known to the injured employee. Rather it is automatic if "those in charge of the work for the independent contractor * * * have knowledge of the danger."

The occupier is thus automatically excused in advance from the necessity of considering the nature of the hazard, the unusual or spectacular capacity of the agency to cause extraordinary harm, the likelihood that employees will not know of the hazard, or the likelihood that a suitable warning will be passed on by the "knowing" independent contractor to employees ignorant of this knowledge. If it turns out that the independent contractor had knowledge, the occupier is home free notwithstanding the circumstances might have shown extreme danger to innocent workmen with no general likelihood that the employer-independent contractor would know of such hazards. Considering that tort law is a judge-made sanction to a developing public policy to protect persons from harm, one can hardly regard a rule as sound if its application depends on fortuitous chance not related to the principle of ordinary prudence.

This and other aspects of the application of the rule to be discussed later cause me to wonder how it is that, as just another Texas court, Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Guaranty Trust Co. v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, we arrive at this decision.

Where Erie leads, there must we, of course, follow. What are the markers employed here? The comment in Baylor Law Review [a] adds little. With extreme caution it suggests the *possible* rule but recognizes that it is not free from doubt. And for its basis, it cites the cases discussed by the Court's opinion.[b] The Reinle case, is of course, diametrically opposed to the conclusion we reach. The basis for rejecting Reinle is that Nance, note b supra, points in the other direction. We must, of course, regard intermediate appellate courts and as we make our Erie way, what they say we must apply with equal fidelity unless it seems quite positive that the highest state court will reject it.[c]

In this situation I do not think we have any such evidence that Nance overrules the past. First, the Reinle case is still very much alive. As recently as 1950 in Smith v. Henger, 1950, 148 Tex. 456, 226 S.W.2d 425, 431, 20 A.L.R.2d 853, it was cited by the Supreme Court of Texas in a context of the duty of an occupier to employees of independent contractors. Second, Nance had a whole series of grounds for holding the alleged vicarious occupier not liable as a matter of law. The first was actual knowledge which the plaintiff Flowers had of the large overhead line strung on H towers.

a. Comment, The Duty to Furnish a Safe Place to Work to the Independent Contractor and His Servants, 11 Baylor L. Rev. 170 (1959).

b. Robert E. McKee, General Contractor v. Patterson, 1954, 153 Tex. 517, 271 S.W. 2d 391; Nance Exploration Co. v. Texas Employers' Ins. Ass'n, Tex.Civ.App. 1957, 305 S.W.2d 621 (error ref'd N.R. E.); Galveston-Houston Electric Ry. Co. v. Reinle, Tex.Civ.App.1924, 264 S.W. 783. The author does not cite the previous and authoritative ruling by the Supreme Court on certified questions in Reinle.

Galveston-Houston Electric Ry. Co. v. Reinle, 1924, 113 Tex. 456, 258 S.W. 803. The Court's reference and quotation is to the Supreme Court's opinion.

c. West v. American Telephone & Telegraph Co., 1940, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139; Six Companies of California v. Joint Highway District, 1940, 311 U.S. 180, 61 S.Ct. 186, 85 L. Ed. 114; Stoner v. New York Life Ins. Co., 1940, 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284; Fidelity Union Trust Co. v. Field, 1940, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109.

Second, by its very structure and the size of the wires strung on the towers, Flowers either knew or should have known of the obvious and open hazard of the drilling rig coming into contact with one of the wires. This invoked the principle elucidated in McKee v. Patterson, note b supra. Third, the defendant sued as the alleged vicarious occupier was not one in fact since the defendant Geophysical Company was in no sense responsible for, or had anything to do with the high power electric line strung and maintained by the utility company. Thrown in as a fourth reason was the asserted rule that the notice to, or knowledge of, the independent contractor insulated the occupier from further concern, responsibility or liability.

The notation of the Supreme Court "Refused N. R. E." (no reversible error) in refusing to grant a writ of error and review Nance indicates that Supreme Court action was confined merely to an approval of the result, not an approval of the reasons or the Court's opinion as would be the case with a writ denied "Refused." [d] Hence the Supreme Court could have approved the result on any number of the reasons advanced for the decision.

As a technical Erie situation, I think that we are not free—whatever our own convictions—to reach this decision. If, as the Court seems to assume from its extended treatment of non-Texas cases, the decision is to be reached after being "persuaded by both precedent and principle" the result is, to me, even more unsound.

It warrants repeating that the rule stated with this articulate precision excludes altogether any inquiry into due care on the part of the occupier. The rule is simple and positive and absolute: if the occupier gives notice of a hazard to the independent contractor, that is all that is required. Under this rule, stated now with awesome finality for all time to come, it does not matter what the kind or type of hazard it is. It does not matter how grave may be the consequences of injury. It does not matter whether in the light of either of these two factors, a prudent occupier would not trust to the independent contractor the essential relaying of the warning to its employees.

A moment's reflection is convincing, at least to me, that such an absolute rule cannot be sound. The industrial scientific world now stands on the threshold of a new and rapidly developing era of nuclear energy. Power of these still unexplored forces is scarcely known. But as with each mechanical development of the industrial revolution, it is known that these modern miracles bring in their train hazards and risks of parallel proportion. Law, of course, cannot divorce itself from these influences, and if it sought to do so, it would no longer be law—certainly not living law. The internal combustion engine did more than merely silence the pipes of Pan.[e] It and the competitive sources of steam, electric and hydraulic power, the irrepressi-

d. Rule 483. Tex.R.Civ.Proc.:
"In all cases where the judgment of the Court of Civil Appeals is a correct one and where the principles of law declared in the opinion of the court are correctly determined, the Supreme Court will refuse the application with the docket notation 'Refused'. In all cases where the Supreme Court is not satisfied that the opinion of the Court of Civil Appeals in all respects has correctly declared the law, but is of the opinion that the application presents no error which requires reversal, the Court will deny the application, with the notation 'Refused. No Reversible Error.' * * *." See "Notations on Applications for Writs of Error"

by Gordon Simpson, Associate Justice Texas Supreme Court, 1945–1949, 12 Texas Bar J. 547 at 574–575 (1949); Simpson, "Problems of Precedent Affecting Court of Civil Appeals Opinions," 4 Southwestern L.J. 398, 402–403.

e. Lord Simonds, Lord High Chancellor of Great Britain, Address to the American Bar Association, 39 ABAJ 1062, 1116 (1953), "* * * [T]here are many who sigh for a more Arcadian simplicity of life. But in Arcadia, the sound of the internal combustion engine had not silenced the pipes of Pan; it is vain to seek pastoral ease in the hearts of great industrial cities."

ble search for efficient fuels with which to meet the insatiable demands of this complex, the production of industrial commodities for consumption or use in further manufacturing, are some of the principal factors bringing into being the modern concept of inherently dangerous goods. The essence of it is that in view of the extraordinary capacity for severe harm, the superior knowledge of those close to the operation, the likelihood that persons exposed to harm will be ignorant of the risks, responsibility is put on one who introduces the thing into the channels of business, and due care is measured against the potential consequences. Indeed, it is just such factors which leads this Court to recognize that since "the evidence * * * would support the findings * * * that the premises contained an inherent, concealed or latent danger" unknown to the plaintiff Bivins, "there arose a duty of Gulf to warn" him.

It takes no special education to remind all of the destructive capacity of nuclear energy when loosed on such a mission. But the peaceful uses of the atom are, or may be, fraught with risks equally portentous.[f] From the handling of fissionable materials arises an acute apprehension of the existence and as yet unknown consequence of radiation. The fear is not limited to likelihood of immediate harm to those within the operational zone of danger. Its impact may be imperceptible and slow in coming. And there is great concern that it ends with the person initially exposed.

It is true, of course, that Bivins was not hurt by these modern scientific miracles. But these factors are relevant in testing a rule stated with an awesome absolutism that warning by the occupier to the independent contractor is, as a matter of law, always and everywhere a complete insulation from liability for harm done to an innocent employee.

One can hardly believe that when putting fissionable materials into the channels of trade, a manufacturer or a distributor (or an occupier who contracts with an independent contractor for its use) can content himself as a matter of law with a notice or warning to his immediate customer. When the consequences for harm are so devastatingly spectacular, both as to those living and perhaps those not yet even conceived, will a routine letter warning be the final measure of operational and legal liability? Must not the law reckon with the facts in a particular case to ascertain whether with the ominous threat of such destruction, a prudent person would rest content on the assumption—or hope—that all in the successive chain would be adequately warned? Would not this be measured, in part at least, by whether the one to whom the "warning" is given has a really adequate understanding of the forces at work, the unique circumstances which make danger more, not less, likely, and the steps to be taken at each successive level if things go wrong?

What I am trying to say is simply this. There are three possible rules. The first was that impliedly followed by the trial court which seems to ignore altogether the fact or significance of a warning by the occupier to the independent contractor. The second, is the rule announced by the majority which makes such a warning always and everywhere an automatic bar as a matter of law. The third, and middle ground, is the one I advance —whether as a fact in each particular case a prudent occupier in the position of the defendant would reasonably have concluded that the particular warning to the independent contractor would in all likelihood be brought home sufficiently to employees who might otherwise be ignorant of the danger.

This is, I submit, the very essence of § 343 of the Restatement of Torts so

---

f. See "The Feasibility of an Atomic Energy Compact for the Southern States," The Southwestern Legal Foundation, Dallas, Sept., 1958, a special research project in response to the request of the Southern Governors Conference; Giler, "Insurance Torts and the Atom," 26 Ins.Counsel J. 17 (Jan. 1959); McNeal "What and When of Atomic Liability," 26 Ins.Counsel J. 21 (Jan. 1959).

often embraced by Texas courts and repeated by the majority at some length. The occupier has a liability if he "(a) knows, or * * * could discover * * * *" the condition which he should realize involves "an unreasonable risk" to employees of independent contractors and he "(b) has [1] no reason to believe that they [2] will discover the condition or [3] realize the risk involved therein * * *." [g]

This necessarily measures responsibility initially from the defendant-occupier's point of view. That is what this Court spelled [h] out in Gulf Oil Corp. v. Wright, 5 Cir., 1956, 236 F.2d 46, 52. There this Court held that in view of the widespread knowledge at this late date of the known presence and dangers of hydrogen sulfide gas in the West Texas oil fields, a prudent occupier could not reasonably have expected that its independent contractor or the employees thereof would be ignorant either of the presence of the gas or its toxic effects. But it was there measured against the facts of that case. So much so was it that we sounded the caveat that on remand ultimate decision would depend upon the facts of the new trial there ordered.

Here the Court announces a rule which is both internally inconsistent and in conflict with the traditional, and here Texas, approach. As to Restatement § 343(a), the Court recognizes that it was a jury issue whether the iron sulfide gas was present and was a danger of which Bivins was ignorant. In other words, this was tested by the facts. But it then abandons the factual inquiry for jury resolution as to the same kind of issues presented in § 343(b). In the very nature of things, is not the question whether the occupier "[1] has no reason to believe" one of fact? By the same token, is not an inquiry whether the employees "[2] will discover the condition" an obvious one of fact, not law? Is it not even more so as to the crucial one whether the employees will "[3] realize the risk involved therein"?

It is entirely possible that on the record of a particular case reasonable minds could accept only the conclusion that a prudent occupier, having given notice of the peculiar hazard, would not have reason to believe that the employees would be ignorant of the condition or its hazards. In that situation a directed verdict would be compelled. But ordinarily it will not be, as the Court now announces, a decision as a matter of law. What a prudent occupier "has reason to believe" depends on the total setting. This includes the nature or kind of dangerous condition, the kind or type of hazard presented, and a balancing of the possible capacity for harm of an extraordinary nature against the likelihood of the independent contractor effectively relaying the warning to his employees. This depends on facts. And where facts permit conflicting inferences, it is for the trier of fact, not the judge, to declare the result.

The Court, listing precedents for the rule announced, ignores altogether the cases to the contrary. Both the Ninth and Second Circuits reject this rule that notice to the independent contractor is either notice to the employee or cuts off his rights. Sullivan v. Shell Oil, 9 Cir., 1956, 234 F.2d 733; Anderson v. Lorent-

g. Brackets inserted for ease in reference.

h. There we said: "This measures it upon the objective standard of what the defendant could reasonably expect others to know. The duty is '* * * to warn such persons of the existence of dangers which could not reasonably be *expected* to be apparent or obvious * * *, Restatement, Torts, § 343', Smith v. Henger, supra at 226 S.W.2d 425, 431." To this was appended footnote 25 which stated: "Justice Calvert, McKee v. Patterson, supra, refers to Dean Keeton's Article 100 Pa.Law Review 629-648."

zen, 2 Cir., 1947, 160 F.2d 173. The Sullivan case from the Ninth Circuit is particularly persuasive since as that opinion reflects, Texas and California concepts are parallel on the open and obvious danger and voluntary assumption of risk principles.

My concern about the decision of the Court here as a precedent arises because the majority states this rule in such precise, positive, unyielding and absolute terms. What this may lead to is demonstrated by the case on which the majority places such great reliance. Storm v. New York Telephone Company, 270 N.Y. 103, 200 N.E. 659. There the defendant telephone company owned and maintained a line of poles. The utility company had, as lessee, fixed its crossarms and strung its wires on these poles. The entire line was being abandoned because the poles were rotten and deteriorated. The plaintiff, an employee of the utility company, was injured while engaged in removing the utility crossarms from one of the last remaining defective poles. To dismantle fittings from poles which were being abandoned because they were rotten and deteriorated is a far cry from our case which the majority properly characterizes as one imposing "liability for a concealed or latent condition of danger not incident to the work to be done."

As Storm proves, big oaks from little acorns grow. Reasons given for a correct disposition of Storm are now the foundation for application of a like sounding rule to a new and entirely different situation.

The rule of prudence applying to the occupier to give rise to the duty should apply as well in the determination of the fulfillment (i. e., discharge) of the duty. That is a question of legal-fact, not a deliverance of law. I therefore dissent.

Rehearing denied: JOHN R. BROWN, Circuit Judge, dissenting.