Jorge VEGA and Eusebio Leon,
Plaintiffs, Appellants,

v.

KODAK CARIBBEAN, LTD.,
Defendant, Appellee.

No. 93–1156.

United States Court of Appeals,
First Circuit.

Submitted June 9, 1993.

Decided Aug. 24, 1993.

Carlos F. Lopez, San Juan, PR, and Maria Del C. Gomez–Cordova, Bayamon, PR, on brief, for plaintiffs, appellants.

Carlos V. J. Davila, Jacqueline D. Novas, and Fiddler, Gonzalez & Rodriguez, San Juan, PR, on brief, for defendant, appellee.

Before TORRUELLA, SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.

William Shakespeare once wrote that "parting is such sweet sorrow." In this case, which requires us to mull the circumstances under which an employee's "early retirement" can be considered a "constructive discharge," plaintiffs' parting with their longtime employer proved more sorrowful than sweet. When plaintiffs sued, the district court added to their pain, granting the employer's motion for summary judgment. 807 F.Supp. 872. We can offer little comfort.

## I

### BACKGROUND

Consistent with the method of Fed. R.Civ.P. 56, we draw upon the undisputed facts to set the stage for what transpired.

Defendant-appellee Kodak Caribbean, Ltd. (Kodak) decided to downsize its operations in Puerto Rico. To this end, it announced the availability of a voluntary separation program (the VSP).[1] On September 15, 1989, Kodak held a meeting to explain the VSP to its local work force. The company distributed descriptive documents to virtually all Kodak employees, save only for certain managerial and human resources personnel, regardless of age or years of service. The written materials spelled out the benefits afforded, the method of calculating severance pay, and how the program would be implemented.

Kodak encouraged workers to participate in the VSP, but did not require them to do

so. Withal, the company informed all its employees that if substantially fewer than twenty-six individuals opted to enter the VSP, others would be reassigned or furloughed in order to reach the desired staffing level.

Two veteran employees, Jorge Vega and Eusebio Leon, were among those who chose to participate in the VSP. After signing an election form on October 4, 1989, Leon received a lump-sum severance payment of $28,163.16 plus other benefits. Vega followed suit on October 10, 1989, executing a similar form and receiving a $52,671.00 severance payment. The men retired on the dates designated in their respective election forms. At no time did either man ask to revoke his election or offer to refund his severance payment.

In 1990, Vega and Leon brought separate suits against Kodak, each alleging discrimination on the basis of age. Their complaints, which invoked the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634 (1988 & Supp. III 1991), and certain Puerto Rico statutes, charged that Kodak's implementation of the VSP violated the law. The district court consolidated the two cases and, on December 10, 1992, granted Kodak's motion for *brevis* disposition.[2] This appeal ensued.

## II

### The Legal Framework

In a wrongful discharge case under the ADEA, the plaintiff bears the ultimate "burden of proving that ... he would not have been fired but for his age." *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir.1988). Absent direct evidence of purposeful age discrimination—and no such evi-

---

1. The record reflects that Kodak's parent company decided to slash costs by reorganizing its operations throughout the United States and, consequently, promulgated the VSP on a nationwide basis. The Puerto Rico reduction in force was part and parcel of this larger reorganization.

2. Appellants' suits triggered the district court's federal question jurisdiction. *See* 28 U.S.C. § 1331 (1988). However, when the district court disposed of the ADEA claims, the pendent claims became subject to dismissal for want of subject

matter jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Gilbert v. City of Cambridge*, 932 F.2d 51, 67 (1st Cir.1991) (similar), *cert. denied*, —— U.S. ——, 112 S.Ct. 192, 116 L.Ed.2d 153 (1992); *Brennan v. Hendrigan*, 888 F.2d 189, 196 (1st Cir.1989) (similar). Hence, we focus exclusively on appellants' ADEA claims.

dence embellishes the record before us—the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), initially requires that a plaintiff establish a prima facie case by demonstrating that he was (i) within the protected age group, (ii) meeting the employer's legitimate performance expectations, (iii) actually or constructively discharged, and (iv) replaced by another individual of similar skills and qualifications, thereby confirming the employer's continued need for equivalent services. *See Mesnick v. General Elec. Co.*, 950 F.2d 816, 823 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). When a reduction in force is involved, a plaintiff may satisfy the fourth element by demonstrating that the employer did not treat age neutrally in shrinking its payroll. This lack of neutrality may be manifested either by a facially discriminatory policy or by a policy which, though age-neutral on its face, has the effect of discriminating against older persons, say, by leading inexorably to the retention of younger employees while similarly situated older employees are given their walking papers. *See Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1110–11 (1st Cir.1989); *Holt v. Gamewell Corp.*, 797 F.2d 36, 37–38 (1st Cir.1986).

Establishing a prima facie case creates a presumption that the employer unlawfully discriminated and shifts the burden of production to the defendant. *See Hebert*, 872 F.2d at 1110–11. At this second stage, the employer must rebut the inference of age discrimination by articulating some legitimate, nondiscriminatory reason for the employment action. *See Mesnick*, 950 F.2d at 823; *Hebert*, 872 F.2d at 1111. If the employer advances the required showing, the inference originally generated by the prima facie case drops from sight. In that event, it falls upon the plaintiff (who bears the burden of persuasion throughout) to show that the employer's alleged justification is a mere pretext for age discrimination. *See Mesnick*, 950 F.2d at 823. To prevail at this third stage, the plaintiff must ordinarily do more than impugn the legitimacy of the employer's asserted justification; he must also adduce

evidence "of the employer's discriminatory animus." *Id.* at 825; *see also Hazen Paper Co. v. Biggins*, —— U.S. ——, ——, ——, 113 S.Ct. 1701, 1706, 1708, 123 L.Ed.2d 338 (1993) (stating that liability under the ADEA depends upon whether age "actually motivated the employer's decision" and hesitating to infer age-based animus solely "from the implausibility of the employer's explanation"); *cf. St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (U.S. June 25, 1993) (holding that success in a race-discrimination suit requires a "finding that the employer's action was the product of unlawful discrimination" and not merely "the much different (and much lesser) finding that the employer's explanation of its action was not believable").

The intersection at which the burden-shifting framework meets Rule 56 is also well mapped. To survive summary judgment, "a plaintiff must establish at least a genuine issue of material fact on every element essential to his case in chief." *Mesnick*, 950 F.2d at 825; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Hebert*, 872 F.2d at 1106. In other words, a plaintiff must adduce some minimally sufficient evidence to support a jury finding that he has met his burden at the first stage, and again at the third stage (so long as the defendant has met its second-stage burden by articulating a nondiscriminatory reason for the adverse employment action). Moreover, the material creating the factual dispute must herald the existence of "definite, competent evidence" fortifying the plaintiff's version of the truth. *Mesnick*, 950 F.2d at 822; *see also Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice. *See Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

On appeal, we afford plenary review to a grant of summary judgment and possess the power to affirm on any independently sufficient ground made manifest by the record. *See Mesnick*, 950 F.2d at 822; *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48–49 (1st Cir.1990).

### III

### *Analysis*

■ On this record, appellants fall prey to Rule 56 at square one, for they have failed to adduce evidence sufficient to establish their prima facie case. We explain briefly.

To satisfy the third element in the prima facie case, ADEA suitors who claim to have been wrongfully ousted from their jobs must demonstrate that they were actually or constructively discharged. Here, appellants concede that they were not cashiered. They maintain, however, that Kodak's sponsorship of the VSP effected their constructive discharges by forcing them into an unpalatable (and unwarranted) choice between early retirement and dismissal.[3] The facts of record, fused with the appropriate legal standard, belie the charge.

Mere offers for early retirement, even those that include attractive incentives designed to induce employees who might otherwise stay on the job to separate from the employer's service, do not transgress the ADEA. *See Henn v. National Geographic Soc'y*, 819 F.2d 824, 828 (7th Cir.) (characterizing an early retirement package as "a boon" to the recipient and not automatically indicative of age discrimination), *cert. denied*, 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987); *see also Hebert*, 872 F.2d at 1111; *Schuler v. Polaroid Corp.*, 848 F.2d 276, 278 (1st Cir.1988). To transform an offer of early retirement into a constructive discharge, a plaintiff must show that the offer was nothing more than a charade, that is, a subterfuge disguising the employer's desire to purge plaintiff from the ranks because of his age. *See Hebert*, 872 F.2d at 1111. Under this dichotomy, offers which furnish employees a choice in name only are impermissible because, in the final analysis, they effectively vitiate the employees' power to choose work over retirement. Phrased another way, the law regards as the functional equivalent of a discharge those offers of early retirement which, if refused, will result in work so arduous or unappealing, or working conditions so

intolerable, that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities. *See Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir.1986); *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977). In terms of this standard, a plaintiff who has accepted an employer's offer to retire can be said to have been constructively discharged when the offer presented was, at rock bottom, "a choice between early retirement with benefits or discharge without benefits," or, more starkly still, an "impermissible take-it-or-leave-it choice between retirement or discharge." *Hebert*, 872 F.2d at 1113.

Kodak's promulgation of the VSP cannot be said to have presented Vega and Leon with this sort of Hobson's choice. The offer was cast as one to be accepted or rejected at an employee's will. The contract and explanatory memorandum contained numerous words and phrases alerting the reader to its voluntary nature. Moreover, the circumstances of the offer were not coercive: employees had six weeks to mull the offer's ramifications before making a decision; they were encouraged to gather information and ask questions; and they retained the right to revoke the election for a period of time. An employer's effort to construct a pressure-free environment conducive to calm decisionmaking in the employee's enlightened self-interest often constitutes the hallmark of a real offer as opposed to an ultimatum. *See Henn*, 819 F.2d at 828–29 (considering similar factors in analyzing the voluntariness of an early retirement plan). So it is here.

Finally, nothing in the record indicates that, for any particular employee, refusing early retirement meant either discharge or the imposition of working conditions so abhorrent as to justify resignation. To be sure, Kodak said that it would likely furlough a number of employees if not enough workers elected to depart voluntarily. But, three things palliate the inference that appellants seek to draw from this statement: (1) the company simultaneously announced, both

---

**3.** We use the euphemism "early retirement" in its broad, nontechnical sense to include any employer-sponsored plan that provides a special benefit to an employee in return for a voluntary decision to withdraw from active employment at an earlier-than-anticipated time. The VSP is such a plan.

orally and in writing, that if a sufficient complement participated in the VSP, the need to thin the ranks unilaterally would never arise; (2) it did not directly or indirectly indicate which particular individuals would be tapped should layoffs prove to be necessary; and (3) it never threatened that persons ultimately selected for involuntary separation would be treated harshly.[4]

Notwithstanding the formidable array of circumstances weighing in favor of a finding that appellants resigned voluntarily, appellants assert that they were constructively discharged because they *believed* that rejecting the VSP was tantamount to forfeiting their jobs. We discern no genuine issue of material fact; assuming that appellants' mindset was as stated, their conclusion does not follow. An employee's perceptions cannot govern a claim of constructive discharge if, and to the extent that, the perceptions are unreasonable. *See Calhoun,* 798 F.2d at 561. Were the rule otherwise, any employee who quit, and thereafter thought better of it, could claim constructive discharge with impunity. The law, therefore, demands that a disgruntled ex-employee's professed belief about the likely consequences of refusing an offer for early retirement be judged by an "objective standard," the focus of which is "the reasonable state of mind of the putative discriminatee." *Id.* (citations and internal quotation marks omitted). In light of the uncontroverted facts of record here, appellants' impression that the ignominy of firing comprised the only alternative to accepting the VSP was thoroughly unreasonable.

In an attempt to coat their subjective beliefs with a patina of plausibility, appellants ignore the fact that no firings or layoffs ever materialized, and, instead, tout a supervisor's statement that Kodak shelters "no sacred cows." This statement, directed not toward Vega and Leon in particular but toward Kodak's entire work force, articulated an unfortunate but hardly remarkable condition of working life: broad-based subjugation to the risk of future termination is common fare in a depressed economic climate. It, alone, is insufficient to constitute constructive discharge. *See Bodnar v. Synpol, Inc.,* 843 F.2d 190, 193–94 (5th Cir.) (holding that the risk, shared by all company employees, that appellants' posts would be eliminated if too few accepted an early retirement plan did not constitute a "working condition[ ] ... so intolerable as to force appellants' resignation"), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Calhoun,* 798 F.2d at 561 (stating that an employee is not "guaranteed a working environment free from stress") (quoting *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986)).

In fine, the record is barren of evidence competent to support an inference that Kodak placed appellants "between the Scylla of forced retirement [and] the Charybdis of discharge." *Hebert,* 872 F.2d at 1112. Rather, Kodak asked its employees to choose between immediate severance with its associated benefits or continued work with its inherent risks. As the alternative to separation from the employer's service was not so onerous as to compel a reasonable person's resignation, appellants cannot convincingly claim to have been constructively discharged.

## IV

### *Conclusion*

We need go no further. Although Kodak has assembled an armada of additional asseverations in support of the decision below, addressing those points would serve no useful purpose. It suffices to say that, since appellants failed to limn a prima facie case of age discrimination,[5] the district court appro-

---

4. For example, Kodak never warned that involuntarily separated employees would be stripped of severance benefits or treated less favorably than those persons who chose to enter the VSP. And, moreover, the company suggested that attempts would be made to offer involuntarily separated employees comparable positions elsewhere in the Kodak organization, as opposed to simply cutting them loose.

5. Because appellants had the burden of adducing evidence on each of the four elements of their prima facie case, the deficiency we have described is fatal to their suits. Thus, although we note in passing that their prima facie case flounders in another respect as well—the record does not support their assertions that Kodak failed to treat age neutrally in its authorship and

priately entered summary judgment in the defendant's favor.

*Affirmed.*

implementation of the VSP—we do not pause to    elucidate the point.