Clovis **BOUCHARD,** Plaintiff,

v.

**GENERAL ELECTRIC COMPANY,**
Defendant.

**Civ. A. No. 92–30122–MAP.**

United States District Court,
D. Massachusetts.

April 18, 1994.

motion for summary judgment.

Frank E. Antonucci, Marcus, Antonucci & Quigley, Great Barrington, MA, for plaintiff.

Ronald E. Oliveira, Diane E. DeGiacomo, Cain, Hibbard, Myers & Cook, Pittsfield, MA, for General Elec. Co.

J. Norman O'Connor, David M. Mongue, Donovan & O'Connor, Adams, MA, for J.H. Maxymillian, Inc.

## MEMORANDUM REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

(Docket No. 22)

PONSOR, District Judge.

### I. INTRODUCTION

Plaintiff Clovis Bouchard was a heavy equipment operator employed by contractor Maxymillian, Inc., a construction company, and in that capacity worked at the premises of General Electric Company ("G.E.") in Pittsfield, Massachusetts. In April, 1989, Bouchard hurt himself when he fell off a ladder while descending into a manhole to determine the location of high voltage electric wires. Plaintiff has sued G.E. for negligence, seeking damages for lost wages, per-

manent disfigurement, and pain and suffering.

G.E. has filed for summary judgment, claiming it owed no duty of care to plaintiff. G.E. argues that it had no operational control of the area in which plaintiff was injured, and that even if it did, its liability was cut off because plaintiff did not heed warnings. G.E. contends that it did not own the faulty ladder which caused plaintiff's injuries.

Viewing the facts in the light most favorable to plaintiff, the court finds there is a genuine issue of material fact regarding whether G.E. had operational control of the area in which plaintiff was injured, whether its warnings not to go into the manhole cut off liability, and whether G.E. owned the ladder. Accordingly, defendant's Motion for Summary Judgment will be denied.

## II. FACTUAL BACKGROUND

The facts, enunciated in the light most favorable to plaintiff non-movant, Bouchard, are as follows.

In 1989, Clovis Bouchard had been an employee of construction contractor J.H. Maxymillian, Inc. ("Maxymillian"), for about 12 years. Bouchard was an operator of backhoes, trucks and other heavy construction equipment.

In early April of 1989, Bouchard was working with Maxymillian at the General Electric plant in Pittsfield, Massachusetts. Maxymillian had contracted with G.E. to demolish certain buildings at the G.E. site, and the contract contained a provision making Maxymillian responsible for the safety of its workers. By April, "Building 32" had been demolished. On April 4 and 5, some Maxymillian workers were engaged in post-demolition work, in connection with which Bouchard was running a backhoe and digging up utility lines running into the former Building 32. His job was to excavate and "cap off" the water and sewer lines and a laborer, Ricky Padgett, was aiding him in this task. Bouchard and Padgett were aware of the presence of high voltage electric wires running underground in the vicinity of their digging project. They were trying to locate these electric lines to avoid damaging them while engaged in the capping off.

Despite the presence of painted stripes on the ground indicating their approximate location, Bouchard was unable to find the power lines. Bouchard claims he was never shown a blueprint map of the lines' location by either G.E.'s electrical foreman, Warren Wood, or by his own supervisor, Chester Trzcinski. Trzcinski had told Bouchard that any questions regarding the electrical power lines should be directed to G.E.'s electrical foreman, Wood.[1]

Bouchard and Padgett, as they had previously been instructed by Trzcinski and Wood, "popped" the covers off several manholes in an effort to pinpoint the lines' location. Manholes are used to service and install various utility wires. The manholes Bouchard and Padgett opened provided access to electric wires, telephone wires, fire alarm wires, or some combination of these three; their covers were not marked to indicate which type of wires they contained.

Warren Wood told Bouchard and other Maxymillian employees that, when seeking the location of power lines, the employees should open manholes and *look* into them to determine the type of lines they contained. No employee of G.E. gave Maxymillian employees explicit consent to descend into manholes, and G.E. had an express policy of disallowing non-G.E. personnel from getting *into* manholes. It was also G.E.'s policy that any tools or equipment used in the manholes had to be removed immediately after the work was done.

Plaintiff had good reason both to be cautious about encounters with power lines and to be skeptical about assurances as to their absence or location. About a month earlier, in a similar job at "Building 100," after a laborer had told him that there were *no*

---

1. Aside from answering such questions, Wood participated in the Maxymillian demolition project only to the extent that if he saw safety problems likely to cause injury, he would intervene in the work and make sure such hazards were handled in such a way as to avoid injuries. If the power in the power lines Bouchard was seeking needed to be cut, it was G.E., though its employee Wood, that would be responsible for cutting the power.

power lines in the area, Bouchard had dug his backhoe into the ground and immediately struck a 13,800 volt power line, causing a fireball to erupt and precipitating a power outage at the G.E. plant. During another digging experience, G.E. had indicated its approximation of a power line's location, and it turned out to be 25 feet away.

In determining the location of the power lines on April 5, Bouchard, as instructed by Wood, peered into a manhole. But from the surface, he was unable to determine what type of utility wires it contained. The wires were at the bottom of the manhole and were covered with dirt. A wooden ladder led into this manhole, and Bouchard could see the top few feet of it. The manhole was not extremely deep, but the ladder only came up to within about two or three feet of the surface. Since he could not determine the identity of the wires, Bouchard decided to use the ladder to go to the bottom of the manhole. According to Bouchard, the ladder looked sound. Bouchard says that when he saw the ladder, he knew it was not one of Maxymillian's. He noticed a small sticker on it that looked like a manufacturer's emblem, which made him think the ladder was new.

The manhole descent did depart from the specific terms of Wood's express permission to "pop" and look into manholes. Bouchard believed, however, that the permission to inspect further was implicit in Wood's instruction, since, in this case, he could not carry out his visual inspection without descending into the hole. He had descended manholes on G.E. property previously for this very same reason. As he stated in his deposition:

> When they say pop the covers and check out and see where the lines go it means to find out where the lines go. How can you find out where the lines go when you can't see where they are going and you don't have the help to send down there yourself?

Bouchard Deposition at 60.

On this occasion, Bouchard had no help from G.E. personnel to find out where the lines went, so he sat on the edge of the manhole and reached a leg down to the ladder's top rung. As soon as his full weight was on the top rung, the ladder, in his words, "disintegrated" under him. Boucher Dep. at ¶ 14. He flung his arms to the sides to catch himself on the cement rim of the manhole. Then his arms "went up around [him] and tore all the muscles off it," and dislocated both of shoulders. Bouchard Dep. at 45, 87. He fell to the bottom of the hole.

After the accident, Steven Tatro–Raynor ("Raynor"), a security guard at G.E., avers that he observed a G.E. employee inspecting manholes, and the inspector allegedly told Raynor that he was looking for ladders.

Bouchard has since had three surgeries, one on the left arm and two on the right, and has been discharged from his employment with Maxymillian. Bouchard claims that G.E. owned the faulty ladder and had operational control over it and the manhole in which it was found, yet failed to warn Bouchard of the condition of the ladder. Plaintiff claims that G.E.'s negligence in leaving the ladder in the hole caused personal injuries, lost wages, permanent disfigurement and pain and suffering.[2]

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any, show the absence of a genuine issue of material fact." Fed.R.Civ.P. 56(c). In order to prevail, a defendant moving for summary judgment has the burden to show that plaintiff has failed to prove an essential element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991). If defendant is successful in this endeavor, the burden shifts to plaintiff to show that the record supports the existence of a "genuine issue of material fact on every element essential to his case in chief." *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993) (quoting *Mesnick v. General Electric Co.*, 950 F.2d 816, 820 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2965, 119

---

**2.** G.E. has impleaded Maxymillian, seeking indemnification. This aspect of the litigation has no bearing on G.E.'s motion for summary judgment.

L.Ed.2d 586 (1992)). A factual issue is "material" if it is capable of altering the outcome of the litigation. *Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 352 (1st Cir.1992). This court must, however, view the evidence "in the light most amiable to non-movant" and "indulge all reasonable inferences favorable to [him]." *Garside v. Osco Drug, Inc.,* 976 F.2d 77, 78 (1st Cir.1992).

### IV. DISCUSSION

■ In order to prevail on this motion, G.E. must show that, on some essential element of plaintiff's claim, the record will not support a finding for plaintiff. G.E. may show that it owed no duty of care to plaintiff, *Jenkins v. Uniroyal, Inc.,* 668 F.Supp. 56, 60 (D.Mass.1987); or that, even if it did owe plaintiff such a duty, it discharged this duty, *see Martinez v. Asarco Inc.,* 918 F.2d 1467, 1471–1472 (9th Cir.1990) (citing *Gulf Oil Corp. v. Bivins,* 276 F.2d 753 (5th Cir.1960), *cert. denied,* 364 U.S. 835, 81 S.Ct. 70, 5 L.Ed.2d 61 (1960)); *Gallo v. Leahy,* 297 Mass. 265, 8 N.E.2d 782 (1937); Restatement (Second) of Torts § 343A (1965)); or that even if there was a duty breached, plaintiff's injuries did not result from this breach. *Jenkins,* 668 F.Supp. at 61 (citing *Massachusetts Practice Tort Law,* § 204 (1979)).

There is no dispute that plaintiff was injured when a ladder broke beneath him, and he fell into a manhole on G.E.'s property in Pittsfield, or that he was lawfully on that property as an employee of contractor Maxymillian. The core issues raised by this motion are whether a reasonable jury could find on this record that defendant had operational control over the area in which the accident occurred, *see Foley v. Rust Intern.,* 901 F.2d 183, 184 (1st Cir.1990); whether its warnings to plaintiff about not descending into manholes severed its liability for plaintiff's injuries, *see Martinez v. Asarco Inc.,* 918 F.2d 1467, 1471–1472 (9th Cir.1990) (citing *Gulf Oil Corp. v. Bivins,* 276 F.2d 753 (5th Cir. 1960), *cert. denied,* 364 U.S. 835, 81 S.Ct. 70, 5 L.Ed.2d 61 (1960)); *Gallo v. Leahy,* 297 Mass. 265, 8 N.E.2d 782 (1937); Restatement (Second) of Torts § 343A (1965)) and whether G.E. owned the ladder from which plaintiff fell. *See Briggs v. Taylor,* 397 Mass. 1010,

494 N.E.2d 1023 (1986). Since a sufficient quantum of evidence supports plaintiff on all these points, the motion for summary judgment will be denied.

### A. Operational Control of the Area

Because the Supreme Judicial Court of Massachusetts has embraced § 414 of the Restatement (Second) of Torts, G.E. cannot be liable if it did not have operational control of the area in which plaintiff was injured. *Corsetti v. Stone Co.,* 396 Mass. 1, 10, 483 N.E.2d 793 (1985). Section 414 states:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

RESTATEMENT (SECOND) OF TORTS § 414 (1965).

In applying Massachusetts negligence law and interpreting the phrase "operational control," the First Circuit has adopted Comment C of § 414 of the Restatement (Second) of Torts, which states:

> It is not enough that the [owner] has merely a general right to order the work stopped or resumed, to inspect its progress or receive reports, to make suggestions or recommendations which need not necessarily be followed, to prescribe alterations or deviations. Such a general right is usually reserved to [owners], but it does not mean that the contractor is controlled as to all his methods of work, or as to his operative detail. *There must be such retention of a right of supervision that the contractor is not entirely free to do the work in his own way.*

*Foley v. Rust Intern.,* 901 F.2d 183, 184 (1st Cir.1990) (citing Restatement (Second) of Torts, § 414, cmt. c (1965) (emphasis added).

In this case, G.E.'s foreman Warren Wood states that he gave permission to Maxymillian employees only to *look* into the manholes, not to enter them, and that only G.E. personnel were permitted to enter manholes. A jury could find that Wood's statement consti-

tuted a specific direction to the contractor about how the work was to be performed. Somewhat inconsistently, G.E. argues that it ceded complete control of the worksite to Maxymillian, but adds that Maxymillian employees were explicitly forbidden by G.E. to enter manholes.

Bouchard concedes that he was told only to .look into manholes, but maintains that he was never expressly *forbidden* from entering manholes. He further asserts that, in a situation like that of April 5, 1989, where G.E. was short of personnel and where it was part of his job to find the electric wires, the permission to "pop" manholes and look into them *constituted* permission to enter them, if an external visual search did not reveal the power lines' location. A jury could find this testimony credible.

Beyond this, even if G.E. did not retain control of the manholes, which it clearly did to the extent that it barred people from entering them, it is not disputed that Wood would have been responsible for shutting off the power in the *lines* Bouchard sought, had this been necessary. Plaintiff's concern about the power lines led directly to the accident.

This analysis need proceed no further. Bouchard has adduced sufficient evidence to show that there is a genuine issue of material fact with regard to the issue of operational control of the worksite within the meaning of *Foley, supra.* The Supreme Judicial Court has emphasized that "[w]hether an employer has sufficient control over part of the work of an independent contractor to render him liable under § 414 is a question of fact for the jury." *Corsetti v. Stone,* 396 Mass. 1, 11, 483 N.E.2d 793 (1985) (citations omitted). In this case, given the existence of much more than a scintilla of evidence supporting plaintiff's position, there is a genuine issue of material fact as to whether G.E. retained operational control over the worksite. *Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### B. *G.E.'s Warnings*

■ The second issue is whether G.E.'s warnings cut off its liability. G.E. contends that, even if it did have complete operational control of the worksite, Warren Wood's warnings to Trzcinski, the Maxymillian supervisor on site, severed G.E.'s liability for Bouchard's accident. G.E. argues that, while landowners do owe a duty of care to persons on their premises, *Mounsey v. Ellard,* 363 Mass. 693, 707–708, 297 N.E.2d 43 (1973), G.E. discharged this duty via its warnings to Trzcinski. *See Martinez v. Asarco Inc.,* 918 F.2d 1467, 1471–1472 (9th Cir.1990) (citing *Gulf Oil Corp. v. Bivins,* 276 F.2d 753 (5th Cir.1960), *cert. denied,* 364 U.S. 835, 81 S.Ct. 70, 5 L.Ed.2d 61 (1960)); *Gallo v. Leahy,* 297 Mass. 265, 8 N.E.2d 782 (1937); Restatement (Second) of Torts § 343A (1965)).

Bouchard counters that Wood's instruction to Bouchard to "look" in the manholes for the electric lines, coupled with Bouchard's knowledge that G.E. lacked sufficient personnel to assist in locating the power line—especially after Bouchard's recent experience of hitting a live power line—made reasonable Bouchard's inference that Wood's instruction to "look" contained implicit permission to "descend," if the visual inspection from the surface was insufficient.

G.E. argues that such an inference is not reasonable, since Wood allegedly told Trzcinski that Maxymillian employees must not enter manholes, and since Trzcinski must have told Bouchard, along with all other Maxymillian employees, not to enter manholes. Bouchard, however, remembers no specific instruction from either Trzcinski or Wood forbidding him to enter manholes, and this fact must be accepted as true for the purposes of this motion.

As above, this analysis need go no further. The record indicates that there is a genuine issue of material fact with regard to whether G.E.'s alleged warnings to Trzcinski severed its liability, or whether Wood's conversation with Bouchard made reasonable Bouchard's inference of implicit permission. Landowner G.E.'s duty to warn of dangerous hidden defects exists regardless of contractual provisions making Maxymillian responsible for on-the-job safety. Since there is a genuine issue of material fact on this issue, summary judgment is inappropriate.

## C. *The Ladder*

■ The final issue is ownership of the ladder. In order to be liable to plaintiff for his injuries, G.E. must have owned the ladder which broke beneath plaintiff on April 5, 1989. This is because, in Massachusetts, a landowner cannot be liable for injuries to persons on its property unless it created the defect, or knew or should have known of the defect yet failed to remove it or to warn of its presence. *Briggs v. Taylor*, 397 Mass. 1010, 494 N.E.2d 1023 (1986); *Sahagan v. Com.*, 25 Mass.App.Ct. 953, 518 N.E.2d 888 (1988).

■ Plaintiff points to several factors which demonstrate that G.E. owned the ladder. The first is that G.E. concedes that only G.E. personnel were allowed inside manholes, and only G.E. equipment, including ladders, could be used by G.E. employees. Supervisor Wood stated in his deposition that any G.E. electrician entering a manhole would use a ladder from G.E.'s electrical shop. Wood Deposition at 26. A jury might find, plaintiff contends, that G.E. controlled the interior of the manhole and was the only party who *could* have left the ladder there.

G.E. counters that this inference is mere speculation. Defendant points to plaintiff's admission in his deposition that he did not know who owned the ladder. The conjectural quality of the evidence on this point, defendant says, precludes a jury finding that G.E. owned the substandard stepladder.

The second item of proof plaintiff offers to show that G.E. owned the ladder is that the ladder "disintegrated" beneath him. This fact, plaintiff argues, indicates that the ladder was decrepit and had been in the manhole for a long time. As with plaintiff's first proffer, G.E. contends that this speculative "proof" of ownership does not permit an inference of ownership of sufficient strength to support a favorable verdict.

Plaintiff's third item of proof of G.E. ownership of the offending ladder is the testimony of Steven Tatro–Raynor, the G.E. security guard who says he encountered a G.E. employee shortly after Bouchard's accident, who said he was checking manholes for ladders. As an indicium of the reliability of this statement, plaintiff argues that it is an admission by a party opponent, in that Raynor was an employee of G.E.

G.E. maintains that Raynor, in his capacity as a security guard, was not an agent of G.E., and thus his statement was not an admission, but inadmissible hearsay. Absent any indicia of reliability, G.E. argues that the testimony cannot be offered to prove that G.E. owned the ladder.

Raynor also claims that he saw a broken ladder being removed from a manhole and that he recognized it as one of G.E.'s ladders (only unpainted wooden ladders are used by G.E.). This testimony obviously suffers no hearsay defect.

Taking the evidence as a whole, a jury may conclude, without undue speculation, that the broken ladder's owner was G.E.

A second argument, independent of Maxymillian's status as a contractor, requires denial of defendant's motion: G.E. had a duty to disclose the presence of the faulty ladder (a latent dangerous condition) to Bouchard based on G.E.'s status as an landowner, *Jenkins v. Uniroyal, Inc.*, 668 F.Supp. 56, 60 (D.Mass.1987) (citing *Mounsey v. Ellard*, 363 Mass. 693, 297 N.E.2d 43 (1973)); *Poirier v. Town of Plymouth*, 374 Mass. 206, 227, 372 N.E.2d 212 (1978); *see* Restatement (Second) of Torts, §§ 342, 410 cmt. f (1965). This duty to disclose existed in spite of any contractual understanding with independent contractors working on the property. *Jenkins* at 61. Moreover, regardless of whether G.E. owned the ladder, the feasibility of its *ability to discover* the presence of the ladder is a genuine issue of fact. *Id.* at 60. Of course, if Bouchard eventually recovers damages from G.E., G.E. may have an indemnification claim against Maxymillian. *Id.* at 61.

In sum, defendant cannot meet its burden of establishing a "complete failure of proof" with regard to an "essential element" of plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986).

## V. CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment is hereby DENIED.