Zehmisch v. Miles Un-Ltd., Inc.          CV-96-571-JD   06/26/98
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Robert Zehmisch

        v.                                Civil No. 96-571-JD

Miles Un-Ltd., Inc., et al.


O R D E R


        The plaintiff, Robert Zehmisch, brought this action against

the defendant, Miles Un-Ltd., Inc., alleging the defendant's

liability under theories of implied warranty, negligence, and

strict products liability.[1]  Before the court is the defendant's

motion for summary judgment (document no. 20).


Background[2]

        On May 7, 1994, the plaintiff, Robert Zehmisch, and his wife

rented a moped from the defendant, Miles Un-Ltd., Inc., for

recreational use on Block Island, Rhode Island.  Prior to leaving

the defendant's premises, the plaintiff examined and test-drove

_____

        [1]The court notes that co-defendant Aetna Casualty & Surety
Co. has already been dismissed from the case.  See Zehmisch v.
Miles Un-Ltd. Inc., NH No. 96-571-JD, RI No. 96-607 (D.N.H. Sept.
23 1996) (endorsed order May 5, 1997).  The defendant's third
party complaint against Travelers Casualty & Surety Company is
not relevant to the instant motion.

        [2]The facts related herein are not in dispute or are alleged
by the plaintiff.

the moped while his wife spoke with a representative of the defendant. The representative tendered two documents to the plaintiff's wife: a rental contract and a document entitled "How To Operate Your Moped/Scooter" (the "checklist"). The rental contract is signed "R Zehmisch" and "Christine Zehmisch," while the checklist is initialed "RZ." The plaintiff and his wife contend, however, that the plaintiff never signed the documents, but rather his wife did so in his place. Clause 8 of the rental contract provided that

> THE LESSOR DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANT-ABILITY. Neither the Lessor nor the owner of the moped shall be liable for any loss, damage, or expense resulting from the acts or omissions of the Lessee or any other person operating the moped during the rental period, including personal injuries and property damage to the Lessee or any other person and the Lessee agrees to indemnify and save harmless the Lessor and/or owner from any loss or damage or expense including reasonable attorneys fees incurred by the Lessor and/or owner in connection herewith.

In addition, the checklist provided that

> IV. I have test-driven the moped/scooter which I have rented and feel able to operate it competently.
>
> . . .
>
> VI. I have been offered the opportunity to inspect the owners manual for the moped/scooter.
>
> VII. I understand that I am renting a moped/scooter at my own risk. I assume responsibility for any injuries or damage which may occur, either to myself or to my passengers, (if the moped/scooter I am renting is designed for passengers) which may occur during my

2

operation of this moped/scooter.

The plaintiff rented a double moped because he intended to carry his wife as a passenger. The moped was rated by its manufacturer to have a maximum weight capacity of four hundred pounds. The plaintiff and his wife cumulatively weighed in excess of five hundred and twenty pounds. Neither the plaintiff nor his wife were made aware of the moped's weight rating, nor were they offered the opportunity to examine the owner's manual of the moped which indicated the moped's weight restrictions. After leaving the defendant's premises on the moped, the plaintiff and his wife were rounding a corner when the plaintiff lost control of the moped. The plaintiff suffered injuries including a severe fracture of his right humerus as well as a fractured tibia and fibula.

The plaintiff filed a complaint against the defendant in Rhode Island superior court asserting that the defendant was: (1) in breach of its warranty of fitness for a particular purpose; (2) negligent in renting the plaintiff the moped; and (3) liable under a theory of strict products liability. After removal by the defendant to federal court, the Rhode Island district judges recused themselves and the case was transferred to the United States District Court for the District of New Hampshire.

3

Discussion

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)). Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light most favorable to the plaintiff, "'indulging all reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). However, once the defendant has submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or

4

denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

The defendant proffers two bases for granting summary judgment on the plaintiff's claims. First, the defendant contends that the plaintiff's claims are precluded by the contractual language cited above. Second, the defendant contends that the plaintiff has failed to establish the elements of a prima facie strict products liability case under Rhode Island law.

As a preliminary issue, the court addresses the plaintiff's argument that the contract and any exculpatory indemnification clauses therein are inapplicable to his claims as he did not sign the documents but rather his wife allegedly signed his name to them. The plaintiff and his wife have supplied their affidavits to this effect. However, both the plaintiff and his wife stated more than once in their depositions that the plaintiff did indeed sign the rental contract. Regarding his signature on the rental contract, the plaintiff stated:

Question [By defendant's counsel]: Did you read that rental contract at the time that you signed it?

Answer [By plaintiff]:   No.

5

Question: Okay.  So you never read that rental [sic]?

Answer:   Well, first of all, my wife filled out the contract; and I just merely signed it.

. . .

Question: Is that a true copy of the rental contract which you signed on May 7, 1994?

Answer:   Yes, it is.

Question: That's your signature at the bottom, under the word – over the words "lessee's signature"?

Answer:   No, I'm not sure it is.  Maybe my wife signed it.  It doesn't look [sic] my signature. That's why I'm saying that.

Question: Is that your wife's handwriting below it?

Answer:   Yes, it is.

Question: It's certainly not your wife's handwriting?

Answer:   Okay.  Then I probably did.

Question: Did your wife fill out the lessee name, address, etc.?

Answer:   Yes, she did.

Question: After she signed it, she handed it to you; and you simply signed it without reading it?

Answer:   Yes.

. . .

Question: Fair to say that nobody prevented you from reading this contract, correct?

Answer:   Fair.  Although I started to fill the date in, and he pulled the contract back and said,

6

you didn't need it.

Dep. of R. Zehmisch, Oct. 20, 1997, at 62-65.  In contrast, the plaintiff's signature of the checklist document was disputed throughout the deposition:

Question [By defendant's counsel]: I'm going to show you what's been marked as Defendant's B.  Are you familiar with that document?

Answer [By plaintiff]:   No.

Question: Have you ever seen it before?

Answer:   I must have.  It looks like my initials.

Question: And you initialed that document, correct?

Answer:   I'm assuming, yes.  I don't remember it, but yes.

Question: You don't dispute that you were given this document on May 7 before the rental and that you initialed it on this document?

Answer:   I got to tell you, that's not my initials. I'm looking at it.  These are not the way I sign my name.  I would never initial that way.

Question: Do you recognize the signature at the bottom of the page?

Answer:   No.

Question: Can you absolutely say, under oath as we sit here, that you did not initial this document?

Answer:   That's not my initials.

Question: Or are you saying you don't recall?

Answer:   That's not my initials.

7

Question: Were you shown this document today?

Answer:   No, I was not.

Question: You've never seen this document?

Answer:   Never before.

Question: And whose initials are those along the right-hand side?

Answer:   Might be my wife's, but I never seen it signed like that.

Question: Is that [your wife's brother's] initials?

Answer:   I don't know.  I looks like a "J," so it could be.

Question: Would it be fair to say, Mr. Zehmisch, that not only were you shown Defendant's Exhibit B at the time you were instructed how to use the vehicle, but you were required to initial this document before you then took the vehicle out on the road?

Answer:   No.

Question: So you think this document is a fake?

[Objection by plaintiff's counsel]:     Objection.

Answer:   I don't know.

[Objection by plaintiff's counsel]:     Objection.

Answer:   It doesn't look like my signature, and I don't recall it.

Question: Do you think that "R.Z." doesn't look the "R" and "Z" --

Answer:   Exactly.

Question: – on Exhibit A?

8

Answer:    Looks very similar.

Question: I think I have to agree.

Answer:    Then, again, I'm not sure.

Question: So you're not sure if that's your initials or
          not?

Answer:    No, I'm not.

Dep. of R. Zehmisch, Oct. 20, 1997, at 70-73.  Similarly, in addressing the rental contract and the checklist, the plaintiff's wife stated:

Question  [By defendant's counsel]:  Now, before you
          rented the moped, did you fill out a lease
          agreement for the moped?

Answer [By plaintiff's wife, C. Zehmisch]:   We –

Question: Contract?

Answer:    We signed, yes.

. . .

Question: Let me ask you this, Mrs. Zehmisch, referring
          to Defendant's B, the rental contract between
          Miles Un-Ltd. and Robert Zehmisch, you see
          that?  You filled out the information at the
          top, correct?

Answer:    Yes.

Question: You signed it at the bottom, correct?

Answer:    Yes.

Question: And your husband signed it at the bottom?

9

Answer:    Yes.

Question: Exhibit C, which says at the top "How To
          Operate Your Moped/Scooter," you do not
          believe that you signed.  However, your
          husband initialed each of those areas down
          the right-hand column where it's indicated
          "R.Z." script writing, correct?

[Objection by plaintiff's counsel]:      Objection. You
                                         may answer.

Answer:    I don't know. You're really confusing me.  I
           don't know.  I don't remember if I saw this
           one or not or whether I read this one or not.
           I honestly don't remember.

Question: Would it be fair to say that the initials in
          the right-hand corner that say "R.Z.," that
          that would be familiar to you as your
          husband's initials?

Answer:    Yes.  Yes.

Question: And the initials directly next to that, would
          it be fair to say that those initials would
          be familiar to you as the initials of
          [plaintiff's wife's brother]?

Answer:    They appear to be my brother's, yes.

Question: Fair to say you're familiar with both the
          handwriting of both your husband and brother?

Answer:    I recognize the handwriting.  Are we talking
           the document?  I don't know whether I read
           this particular document.  I don't remember.

Dep. of C. Zehmisch, Oct. 20, 1997, at 18, 21-22.

Both the plaintiff and his wife stated in their deposition

10

that the plaintiff signed the rental contract.[3]  Although at one point the plaintiff states that he is not sure if he did sign the contract as it did not look like his signature, he also said "I just merely signed it," agreed three times that he signed the contract, and stated that he probably did sign the contract.  See Dep. of R. Zehmisch, Oct. 20, 1997, at 63-64.  Again, his wife also stated that he signed the rental contract.  See Dep. of C. Zehmisch, Oct. 20, 1997, at 18, 21.

In direct contradiction to the depositions, the plaintiff and his wife swear in their affidavits that he never signed the rental contract, but that his wife signed the contract in his place.  Neither have provided any explanation for the inconsistencies between the events related in the depositions and in

---

[3]The court notes the ambiguity during the depositions regarding the labeling of the rental contract as defendant's exhibit A and the checklist document as defendant's exhibit B. However, each time the plaintiff or his wife acknowledged signing the rental contract, any ambiguity was resolved by clear reference to the contract as the "rental contract" or the "lease agreement."  Moreover, circumstantial evidence indicates clear reference to the rental contact when the plaintiff and his wife acknowledged that they signed it:  (1) Only the rental contract had information to fill out at the top, and signature lines for both the operator and the passenger, see Dep. of C. Zehmisch at 18, 21; Dep. of R. Zehmisch at 63-64; (2) Only the rental contract had the words "Lessee's Signature" on it, see Dep. of R. Zehmisch at 63; (3) Only the rental contract had Mrs. Zehmisch's signature below that of "R. Zehmisch," see Dep. of R. Zehmisch at 64; and (4) Only the rental contract had a partially completed date, see Dep. of R. Zehmisch at 64-65.

11

the affidavits. Counsel for the plaintiff and his wife was present at the time of the deposition to clarify any ambiguity. Moreover, the affidavits were prepared solely for the purpose of this summary judgment motion. "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994). Therefore, under these circumstances, the court disregards the self-serving statements of the plaintiff and his wife that the plaintiff never signed the rental contract.

The court cannot come to a similar conclusion regarding the checklist. At the depositions, neither the plaintiff, nor his wife, gave a clear answer to the question of whether he signed or initialed the checklist document. Indeed, the transcript reflects considerable dispute during the depositions on this point. The court therefore must give credence to the affidavit of the plaintiff stating that he did not initial or sign the checklist document.

I. Disclaimer, Exculpatory, and Indemnity Clauses

The parties do not dispute that Rhode Island law controls

12

the substantive legal issues in this case.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Pursuant to Rhode Island law, exculpatory and indemnity clauses are valid if they are clear, unambiguous and specific.  See Rhode Island Hosp. Trust Nat. Bank v. Dudley Serv., 605 A.2d 1325, 1327 (R.I. 1992); Di Lonardo v. Gilbane Bldg. Co., 334 A.2d 422, 423-424 (R.I. 1975).  Contractual clauses are "ambiguous only when [they are] susceptible of more than one interpretation."  Nelson v. Ptaszek, 505 A.2d 1141, 1143 (R.I. 1986) (finding release clause valid); Fryzel v. Domestic Credit Corp., 385 A.2d 663, 666 (R.I. 1978).  Moreover, both exculpatory and indemnity clauses "require[] a strict reading against the party seeking to be exonerated."  Di Lonardo, 334 A.2d at 423 n.1.; see also A & B Constr. Inc. v. Atlas Roofing & Skylight Co., 867 F. Supp. 100, 107 (D.R.I. 1994).

The plaintiff asserts that the defendant breached its warranty of fitness for a particular purpose.  As discussed above, the rental contract states specifically that:  "THE LESSOR DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY."  A written disclaimer of an implied warranty of fitness for a particular purpose is valid under Rhode Island law if it is conspicuous.  See R.I. Gen. Laws § 6A-2.1-214(2) (1998).  However, the language must be adequate to indicate that the warranty is being disclaimed; it must include language to the effect that "there is no

13

warranty that the goods will be fit for a particular purpose."
Id. The disclaimer here refers only to a warranty of merchant-
ability, and contains no other language such as "as is" or "with
all faults" that in common understanding would indicate to the
lessee that the warranty of fitness may also be disclaimed. See
id. at § 6A-2.1-214(3). The clause therefore fails to preclude
the plaintiff's claim that the defendant breached its warranty of
fitness.[4]

The contract further provides that the defendant is not
liable for damages "resulting from the acts or omissions of the
Lessee or any other person operating the moped," and that the
"Lessee agrees to indemnify and save harmless the Lessor and/or
owner . . . in connection herewith." Def.'s Ex. A. The broadest
reading of this provision would exculpate the defendant from any
liability for any damages that arose as a result of the
plaintiff's acts or omissions. Pursuant to this reading, because
the plaintiff was operating the moped when he was injured, the

---

[4]A warranty of fitness for a particular purpose can be
negated by inspection of the goods, or refusal to inspect, where
such inspection would have revealed the defect complained of.
See R.I. Gen. Laws § 6A-2.1-214(3)(b) (1998). The court does not
find such a negation on this record because: (1) the plaintiff's
test-drive and inspection of the moped without the additional
passenger would not have revealed the defect in this case; and
(2) the record leaves it subject to dispute whether the plaintiff
or his wife were ever offered the moped manual for their
inspection.

defendant would be shielded from liability for the plaintiff's injuries. Moreover, the clause would require the plaintiff's indemnification of the defendant for damages arising from his operation of the moped.

Another reasonable reading of the clause, however, is that it was intended to protect the Lessor and owner of the moped from the misfeasance, malfeasance, or nonfeasance of the plaintiff or other operator of the moped; it was to protect from liability "resulting from the acts or omissions of the Lessee or any other person operating the moped," but not from liability that arises from the Lessor's or owner's acts. Id. Here, where the plaintiff is alleging, inter alia, that the cause of the accident was the defendant's breach of its warranty and its negligence in renting a moped that was not rated for the plaintiff's use with his wife, the injury could be understood to result not from the acts of the plaintiff, but instead from the acts of the defendant. To the extent that the defendant's actions are the proximate cause of the plaintiff's injuries, the defendant's liability for such acts would not be precluded by such a reading of the clause, and liability would not be transferred to the plaintiff.

As just noted, the court perceives more than one reasonable interpretation of the contract clause, and the clause therefore

15

is ambiguous.  See Nelson, 505 A.2d at 1143.  In any event, as the Supreme Court of Rhode Island stated in Di Lonardo, a rule of strict construction will be applied against the party seeking to be exonerated.  See 334 A.2d at 423 n.1.  The court accordingly rejects the defendant's motion for summary judgment premised upon the exculpatory indemnification clause of the rental contract.


II.  Assumption Of The Risk

As discussed above, the checklist provided that:

I understand that I am renting a moped/scooter at my own risk.  I assume responsibility for any injuries or damage which may occur, either to myself or to my passengers, (if the moped/scooter I am renting is designed for passengers) which may occur during my operation of this moped/scooter.

Def.'s Ex. B.  The court assumes for the purposes of this discussion only that the plaintiff was bound by the checklist document.

In Kennedy v. Providence Hockey Club, Inc., 376 A.2d 329 (R.I. 1977), the Supreme Court of Rhode Island addressed the doctrine of assumption of the risk under Rhode Island law, stating "we have limited the application of assumption of the risk doctrine to those situations where the claimant had actual knowledge of the hazard."  Id. at 332.  "It seems to us that one who 'sees, knows, understands and appreciates' what he is doing

16

. . . is worlds apart from one who unwittingly and unsuspectingly falls prey to another's negligence." Id. at 333 (citations omitted). The inquiry is therefore subjective and asks whether the plaintiff saw, knew, understood and appreciated the risks. See Labrie v. Pace Membership Warehouse, Inc., 678 A.2d 867, at 872 (R.I. 1996).

In this case, the plaintiff alleges that the defendant breached its warranty of fitness and negligently rented him a moped that could not carry the weight of him and his wife. There are no allegations that the plaintiff had actual knowledge that he and his wife, who collectively weigh in excess of 520 pounds, were renting a moped rated to carry a maximum of 400 pounds. The plaintiff therefore cannot be said to have knowingly assumed the risks of the defendant's asserted negligence, breach of its warranty, or lease of a defective product. The court accordingly rejects the defendant's argument for summary judgment predicated upon the plaintiff's alleged assumption of the risk.

III. Strict Products Liability

Rhode Island has adopted the doctrine of strict products liability formulated in the Restatement (Second) of Torts § 402-A (1965). See Ritter v. Narragansett Elec. Co., 283 A.2d 255, 261 (R.I. 1971). Pursuant to the Restatement:

17

One who sells any product in a defective condition
unreasonably dangerous to the user or consumer or to
his property is subject to liability for physical harm
thereby caused to the ultimate user or consumer, or to
his property, if (a) the seller is engaged in the
business of selling such a product, and (b) it is
expected to and does reach the user or consumer without
substantial change in the condition in which it is
sold.

Restatement (Second) of Torts § 402-A (1965).

The defendant argues that summary judgment is warranted on
the plaintiff's strict liability claim as the plaintiff has
failed to adduce evidence that there was a design or manu-
facturing defect, or that the alleged defect was the proximate
cause of the plaintiff's injuries. Summary judgment is
appropriate where the plaintiff has failed to establish each
element of its prima facie case. See Vega v. Kodak Caribbean,
Ltd., 3 F.3d 476, 481 (1st Cir. 1993). However, this argument
was only raised in the context of the defendant's supplemental
memorandum in support of its motion for summary judgment, not in
its motion for summary judgment, and the plaintiff has not
responded to it. The court therefore denies the defendant's
motion as to the plaintiff's strict products liability claim
without prejudice to the defendant to renew its argument in a
partial motion for summary judgment to be filed not later than
July 8, 1998.

## Conclusion

For the reasons stated above, the court denies the defendant's motion for summary judgment (document no. 20). The defendant shall have until July 8, 1998, to file a partial motion for summary judgment on the plaintiff's strict products liability claim.

In the opinion of the court, the plaintiff should select his strongest theory supporting recovery and proceed with it instead of seeking recovery under several different theories.

Counsel for the parties shall promptly contact Deputy Clerk Deborah Eastman-Proulx to schedule a mediation of this case before Magistrate Judge James Muirhead. The court expects the parties to engage in good faith efforts to seek a non-trial resolution of this case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

June 26, 1998

cc:  Paul S. Cantor, Esquire
     Mark J. Hagopian, Esquire
     Mark C. Hadden, Esquire
     James A. Ruggieri, Esquire
     Clerk, USDC-RI

19